IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 27, 2010 Session

**STATE OF TENNESSEE v. KENNETH MEYER**

**Appeal from the Circuit Court for Bledsoe County**
**No. 55-2007     Thomas W. Graham, Judge**

_____

**No. E2009-02294-CCA-R3-CD - Filed November 16, 2010**

_____

The Defendant, Kenneth Meyer, was found guilty by a Bledsoe County Circuit Court jury of voluntary manslaughter, a Class C felony. See T.C.A. § 39-13-211 (2010). He was sentenced as a Range II, multiple offender to ten years' confinement. On appeal, he contends that (1) the evidence was insufficient to support his conviction, (2) the trial court erred by admitting only part of a 9-1-1 tape into evidence, (3) the trial court erred by admitting hearsay into evidence, (4) the state improperly withheld exculpatory evidence, (5) the trial court erred by refusing to issue a self-defense instruction requested by the Defendant, (6) the trial court erred by considering prior criminal convictions that were not proven by certified copies of conviction and were not disclosed to the Defendant before the sentencing hearing, and (7) the trial court imposed an excessive sentence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and J.C. MCLIN, JJ., joined.

Edward L. Boring, Pikeville, Tennessee, for the appellant, Kenneth Meyer.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General and Reporter; James Michael Taylor, District Attorney General; and James William Pope, III, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to an altercation between the Defendant and Frank Vestal in which the Defendant shot Mr. Vestal, who died from his wounds. At trial, the victim's girlfriend, Patricia Mudica, testified that she and Mr. Vestal shared a home on Raccoon Ridge Road.

She said that the victim drank five beers and took three pain pills on the day of the shooting. That evening, she and the victim went to the home of Kim Bailey, which was located next to the Defendant's home on Raccoon Ridge Road. Ms. Mudica said she and the victim left the Bailey home and drove to the Defendant's home to allow the victim to apologize to the Defendant for an incident that occurred two days earlier.

Ms. Mudica testified that they arrived at the Defendant's home between 11:00 p.m. and 11:30 p.m. She said that the Defendant lived in a motor home at the end of a gravel driveway and that their truck's headlights were the sole source of light in the area. She said the victim revved his engine twice in an attempt to get the Defendant's attention. She said the Defendant ran out of his home, completely nude, carrying a gun. She said the victim turned off the truck's headlights to prevent her from seeing the Defendant "running around naked." She said that she could not see what occurred afterwards due to the darkness but that the truck's windows were rolled down, enabling her to hear what occurred.

Ms. Mudica testified that after leaving his home, the Defendant yelled, "Who the f--- is it?" She said the victim identified himself and was told, "Get the f--- off my property." She said the victim agreed to leave the property. The Defendant again told the victim to leave, and the victim repeated that he would leave the property. Ms. Mudica then heard a gunshot. She heard the victim say, "Oh f---," and heard a second gunshot a few moments later. She said she turned on the truck's headlights but was unable to see the victim or the Defendant, who had returned to his home. She turned off the headlights when the Defendant then left his home because she was afraid the Defendant would shoot her. She said the Defendant, now clothed, ran to the truck and began screaming and asking why she was there. She asked the Defendant where the victim was and was told that the victim was lying in the ditch, dead. Ms. Mudica said the Defendant threatened to shoot her if she did not leave the property. She said the Defendant left, saying he was calling the police.

Ms. Mudica testified that she turned the truck lights on and ran to the victim. She attempted but was unable to move him because he was covered in blood. She said she returned to the truck, attempted to drive, and accidentally backed the truck into a tree. She said that the truck became disabled and that she ran away.

Ms. Mudica testified that neither she nor the victim possessed marijuana or a weapon when they went to the Defendant's home. She said she did not hear the victim threaten the Defendant before being shot.

On cross-examination, Ms. Mudica admitted that she and the victim drove by the Defendant's home multiple times that day but did not stop to apologize until 11:30 p.m. She agreed that the Defendant did not invite the victim to his home. She agreed that she could

not see the shooting or where it occurred and that she found the victim's body within feet of the truck.

Ms. Mudica testified that she and the victim began dating when she was seventeen and that the victim was married. She said that the victim did not have a regular job and that she made it a point not to make "his business" her business. She agreed the victim drank five beers and took three hydrocodone pills on the day of the shooting, despite not having a prescription for the pills.

On redirect examination, Ms. Mudica testified that she found the victim's body five or six feet from the motor home but stated that this was just a guess. She said she did not see a weapon near the victim's body.

David Vestal, the victim's uncle, testified that he was at the Bailey home on the night of the shooting. He said the victim was in a good mood. He said the victim had recently finished working on an upholstery job. He said the victim did not possess marijuana that night. On cross-examination, Mr. Vestal testified that the victim drank five or six beers on the day of the shooting. He admitted that the victim asked him if he had any marijuana because the victim wanted to "smoke a joint." He said no one at the Bailey home had any marijuana. He said he did not see the victim smoke marijuana that night.

Greg Gibson testified that he was at the Bailey home on the night of the shooting. He said the victim was in a good mood. He said the victim did not possess marijuana that night.

Teletha Reed, a 9-1-1 dispatcher, testified that she took a call from the Defendant on the night of the shooting. She said her office records each 9-1-1 call, including the call from the Defendant. She identified the recording of the Defendant's 9-1-1 call. The first six minutes of that call were played for the jury. The tape reflects that the Defendant told Ms. Reed he was awakened by the victim, whom he asked to leave his property. The Defendant said the victim threatened his life and advanced on him, forcing him to shoot the victim. The Defendant stated that he was unsure if the victim had a weapon. The Defendant also stated that he had been having problems with thieves breaking into his home. After the tape finished, Ms. Reed read from a transcript of later portions of the 9-1-1 call, noting that the Defendant stated, "Ma'am, I wish he wasn't dead . . . I hate the idea of having to go to prison over some f------ a------ like this . . . . Things are not fine. This is a nightmare."

Tennessee Bureau of Investigation Agent Mark Wilson testified that he investigated the victim's death. He said the truck driven by the victim was found 106 feet from the victim's body. He said the police found a can of beer in the truck's cup-holder but did not find weapons or marijuana in the truck. He observed a shotgun, four shell casings, and a

bloody beer can near the victim's body. He said the police did not find weapons or marijuana on the victim's body.

Agent Wilson testified that the victim was covered in blood and had gunshot wounds to his chest, arm, and face. He said the victim's body was located at the bottom of a gradual embankment. He observed pools of blood at both the top and bottom of the embankment, with a trail of blood moving about halfway down the embankment.

On cross-examination, Agent Wilson testified that Detective Ricky Seals measured and recorded the distance between the victim's body and the door to the Defendant's home. The distance recorded was twenty-six, but Agent Wilson could not determine if that distance was in feet because the unit of measurement was not listed. He said that Detective Seals also measured and recorded the distance between the victim's head and the pool of blood at the top of the embankment. The distance recorded was thirteen and one-half but did not contain a unit of measurement. He found no evidence indicating that the victim's body was moved after the shooting.

Tennessee Bureau of Investigation Agent Steve Scott testified that he was a firearms examiner. He said he examined the Defendant's shotgun and determined that the shotgun shell casings found near the victim's body were fired by the Defendant's gun. He identified shotgun pellets taken from the victim's body as being consistent with the ammunition used in the Defendant's shotgun. He said that he could not determine if the pellets were fired from the Defendant's gun because the design of shotgun shells made such identifications very rare.

Adele Lewis, a forensic pathologist, testified that she performed an autopsy on the victim. She said the victim was shot in the chest and arm, with pellets lodging in his chest, back, arms, and chin. She removed pellets from the victim's chin and rear-left shoulder. She also removed shotgun wadding from the victim's arm. She said, "[I]f you see wadding inside a shotgun wound, the distance from the . . . weapon to the person who has been shot is less than eight to ten feet." She estimated that the victim was eight feet away from the shotgun when he was shot in the arm and two to four feet away when he was shot in the chest. Ms. Lewis testified that she performed blood tests on the victim. He tested positive for alcohol, marijuana, and valium. She said the victim did not have hydrocodone in his system.

The Defendant testified that he worked at Ace Transmission Service in Knoxville. He said that on the night of the shooting, he went to sleep at 8:00 p.m. because he had to wake up at 4:00 a.m. the next morning for work. He said he awakened to headlights shining on his motor home. He said he walked outside, taking his shotgun with him because "It's a rural area, you hear gunfire all the time . . . [I had it] to be able to protect myself . . . ." He said he did not know who was outside because he had not invited anyone to his home.

The Defendant testified that he heard the victim yell, "It's Frank, I have some marijuana I want to sell you." He replied that he did not want to purchase any and instructed the victim to leave. He said he attempted to load his shotgun when the victim left the truck, which he estimated was about forty feet from his home. The Defendant again told the victim to leave the property and loaded his shotgun. He said the victim continued to walk toward him despite being told to leave. He said the victim threatened him by stating that "he was going to get me when I come off my property, he was going to do me in . . . ." The Defendant said he was scared for his and his son's lives. Because it was dark, he was unable to tell if the victim was armed. He said that the victim took two more steps towards him and that he accidentally shot the victim. He said the victim charged at him and he again shot the victim. The victim fell to the ground, landing near the Defendant's feet. He said that the shooting was a reaction, not a conscious decision, and that he did not intend to kill the victim. He said he did not threaten Ms. Mudica before or after the shooting. The Defendant testified that he dropped the shotgun and called 9-1-1. He said he spoke with the 9-1-1 operator for about thirty minutes.

On cross-examination, the Defendant testified that he met the victim for the first time about one month before the shooting. He said that two nights before the shooting, the victim walked by his home between 11:30 p.m. and 12:00 a.m., causing the Defendant's dog to bark. The Defendant said he went outside, naked and armed with his shotgun, and saw the victim and his dog loitering in the Defendant's driveway. The victim told the Defendant he was out for a walk. The Defendant said that he told the victim not to come around his home in the middle of the night but that he did not threaten the victim. He said the victim replied that if his daughter had seen the Defendant naked, he would have to "do something" to the Defendant. The Defendant said that he did not consider the victim's statement to be a threat and that the victim continued on his walk.

The Defendant testified that the victim had not attempted to sell marijuana to him before the night of the shooting. He said he did not see the victim in possession of marijuana. He said that he rejected the victim's offer and that the victim threatened to harm the Defendant the next time the Defendant left his property. The Defendant agreed that the victim did not state that he had a weapon or that he was going to cause immediate harm to the Defendant. He said that the victim came toward him, despite seeing the shotgun in his hands, and that he accidentally shot the victim. He said he was unsure if the first shot hit the victim because it was dark. He said the victim charged him, forcing him to shoot the victim a second time in self-defense. The Defendant testified that he did not move during the encounter. He said he was five or six feet in front of his home when he shot the victim.

The Defendant testified that his home had been broken into. He said thieves stole a nine-millimeter pistol from his home.

Upon the foregoing proof, the jury found the Defendant guilty of voluntary manslaughter. A sentencing hearing followed.

At the sentencing hearing, Detective Seals testified that he investigated the shooting. He said he found between three and five marijuana plants growing outside of the Defendant's home. He also found marijuana seeds inside the home. He said the plants and seeds were confiscated and destroyed.

Detective Seals testified that the Defendant's home was burglarized at least twice before the shooting and that he investigated those burglaries. During those investigations, the Defendant expressed concern regarding people entering his property without permission. Detective Seals said that after the shooting, the Defendant's home and car were set on fire.

Angie Dotson testified that she worked for the Board of Probation and Parole and that she prepared the Defendant's presentence report. She said that during her interview with the Defendant, he used vulgar language and was "extremely hostile, angry, not very forthcoming . . . ." She said the Defendant would not answer questions related to his finances and told her that he would not pay restitution if ordered.

Ms. Dotson testified that the Defendant had a history of criminal activity and probation violations in Manatee County, Florida. She said that in 1980, the Defendant was convicted for trespass of a conveyance and resisting an officer with violence and received one year of probation. While on probation, the Defendant was convicted for possession of marijuana, possession of narcotic equipment, criminal mischief, and operating a motor vehicle without a valid registration. She said the Defendant's probation was revoked. She said that the Defendant was again placed on probation in October 1985 but that his probation was revoked again in March 1986. She said she obtained this information by speaking with the circuit court clerk in Manatee County, Florida. The clerk sent her a certified copy of a progress report listing the Defendant's offenses in Florida. However, she was unable to obtain certified copies of the probation violation orders due to the expense involved in obtaining them. She said the state Board of Probation and Parole did not provide her with the funds to obtain certified copies of out-of-state convictions or out-of-state probation violation orders.

The prosecutor showed Ms. Dotson a certified copy of a progress report obtained from the circuit court clerk in Manatee County, Florida, and Ms. Dotson testified that the report reflected that the Defendant pled guilty to misdemeanor battery in 1987. The prosecutor explained that the State obtained this report independently when it was included with two certified convictions sent from the circuit court clerk in Manatee County, Florida.

-6-

Ms. Dotson testified that in 1990, the Defendant was convicted of marijuana possession. She said she obtained this information from the National Crime Information Center in Phoenix, Arizona but was unable to obtain a certified copy of the conviction due to the expense involved in obtaining it. She said that she asked the Defendant about this conviction during the presentence interview and that he responded, "Yeah, I had some trouble with marijuana, but that was about 15 years ago."

On cross-examination, Ms. Dotson testified that the majority of the Defendant's criminal behavior occurred when he was between the ages of eighteen and twenty-one and that his two felony convictions occurred when he was twenty-one. She said the Defendant had a few misdemeanor convictions over the last twenty-five years, including assault and violating the driver's license law.

Christy Vestal, the victim's widow, testified that she and the victim had five children. She said she relied on her husband's support to raise their children. She said the victim worked at Freeman's Upholstery, paid her bills, and provided for their children. She admitted that the victim lived with Ms. Mudica at the time of the shooting but denied that they were legally separated.

The trial court sentenced the Defendant as a Range II, multiple offender to ten years' confinement. This appeal followed.

## I

The Defendant contends that the evidence was insufficient to support his conviction because the evidence did not sufficiently rebut his claim of self-defense. The State contends that the evidence was sufficient to support the Defendant's conviction for voluntary manslaughter. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

As pertinent to this appeal, "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). A person acts "knowingly" with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result. Id. § 39-11-106(a)(20) (2010). Whether a killing results from "adequate provocation" is a question of fact for the jury. State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). Whether a defendant acted in self-defense is also a question of fact for the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). When determining whether a defendant acted in self-defense, a jury must consider "whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995).

The jury's verdict reflects that it rejected the Defendant's claim of self-defense. Taken in the light most favorable to the State, Ms. Mudica testified that she and the victim arrived at the Defendant's home around 11:30 p.m. and woke the Defendant. The Defendant left his home, nude and armed with a shotgun, and told the victim to leave. The victim said he would leave but was shot by the Defendant. Ms. Mudica testified that the victim did not have a weapon and did not threaten the Defendant before being shot. The Defendant testified that he did not see a weapon on the victim. The Defendant agreed that the victim did not state that he had a weapon or that he was going to cause imminent harm to the Defendant. The Defendant admitted to shooting the victim twice with a shotgun.

We conclude that a rational trier of fact could have found the elements of voluntary manslaughter beyond a reasonable doubt. We hold that the evidence is sufficient to support the Defendant's conviction.

## II

The Defendant contends that the trial court erred by admitting part, but not all, of a 9-1-1 call into evidence. The Defendant argues that the excluded portion demonstrated the Defendant's remorse and contained the sound of three distant gun shots, which showed the environment of the surrounding area on the night of the shooting. The State contends that the Defendant has waived this argument by failing to include the excluded portions of the call in the record. The State contends, in the alternative, that the excluded portion of the call was irrelevant and potentially misleading. We agree that the Defendant has waived this issue.

The trial court allowed the first six minutes of the 9-1-1 call to be played. Although the court would not allow the remaining thirty minutes to be played because it found that the

majority of this portion was not relevant to the shooting, it allowed the Defendant to select sections of the 9-1-1 call transcript that he wanted read to the jury. The court permitted each section chosen by the Defendant to be read to the jury.

The Defendant did not include the complete 9-1-1 tape in the appellate record. On appeal, he had "a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993) (citing State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983)). "Where the record is incomplete and does not contain . . . portions of the record upon which the party relies, an appellate court is precluded from considering the issue." Id. at 560-61 (citing State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988)). We must presume that the trial court's determination not to play the entire tape was correct. See State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991) ("In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence."); Roberts, 755 S.W.2d at 836. The Defendant is not entitled to relief on this issue.

## III

The Defendant contends that the trial court erred by admitting hearsay evidence when it allowed him and Ms. Mudica to testify about an altercation between the victim and the Defendant two nights before the shooting. The State contends that the Defendant has waived this argument by asserting this theory of exclusion for the first time in his motion for a new trial and on appeal. We agree with the State.

At trial, the Defendant objected to admitting testimony regarding the altercation between himself and the victim on the ground that it was inadmissable character evidence. However, the Defendant contended in his motion for a new trial and on appeal that such testimony should be excluded because it was inadmissible hearsay. Additionally, we note that although the Defendant asserted this new ground for exclusion in his motion for a new trial, he did not address this ground during the motion hearing and instead argued that this testimony was impermissible character evidence.

This court has stated that "'a party is bound by the ground asserted when making an objection. The party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court.'" State v. Gilley, 297 S.W.3d 739, 765-66 (Tenn. Crim. App. 2008) (quoting State v. Adkisson, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994)); see also State v. Matthews, 805 S.W.2d 776, 781 (Tenn. Crim. App. 1990) ("It has long been established in this jurisdiction that an accused may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis or ground for his contention

in this Court."). As a result, the Defendant has waived this issue. See Gilley, 292 S.W.3d at 765-66; State v. David Dwayne Smith, No. E2007-00084-CCA-R3-CD, Cumberland County, slip op. at 23-24 (Tenn. Crim. App. Dec. 18, 2007) (stating that a defendant waived an issue regarding the admission of testimony when he asserted a hearsay theory of exclusion for the first time in his motion for new trial and on appeal), app. denied (Tenn. Aug. 17, 2009). The Defendant is not entitled to relief on this issue.

## IV

The Defendant contends that the State improperly withheld exculpatory evidence by failing to provide him with the measurements of the crime scene made by Detective Seals. The Defendant argues that these measurements would have helped establish his claim of self-defense and his claim that he was in the curtilage of his motor home when he shot the victim. The State contends that there was no error because the measurements were not favorable or material to the Defendant's case. We agree with the State.

In Brady v. Maryland, the United States Supreme Court held that the prosecution has a constitutional duty to furnish an accused with exculpatory evidence pertaining to either the accused's guilt or innocence or the punishment that may be imposed. 373 U.S. 83, 87 (1963). Failure to reveal exculpatory evidence violates due process when the evidence is material either to guilt or punishment, irrespective of the prosecution's good faith. Id.

The "prosecution is not required to disclose information that the accused already possesses or is able to obtain." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). Although the State is not obligated to disclose the entirety of the investigatory police work in a case, the State is required to disclose all favorable evidence obtained by any person acting on the government's behalf. See Moore v. Illinois, 408 U.S. 786, 795 (1972)). Evidence that is "favorable to the accused" includes evidence that is deemed to be exculpatory in nature and evidence that could be used to impeach the State's witnesses. State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995); State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); see also United States v. Bagley, 473 U.S. 667, 676 (1985).

The Tennessee Supreme Court has held that in order to establish a Brady violation, four elements must be shown by the defendant:

> (1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

> (2) that the State suppressed the information;

(3) that the information was favorable to the accused; and

(4) that the information was material.

State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995); see also Walker, 910 S.W.2d at 389. The Defendant must prove a Brady violation by a preponderance of the evidence. Edgin, 902 S.W.2d at 389.

When considering whether there is a Brady violation, evidence is considered material only "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Id. at 390 (quoting Kyles, 514 U.S. at 433). The question is not whether the Defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Kyles, 514 U.S. at 434.

The record shows that during discovery, the Defendant requested all "documents . . . in the possession . . . of the State, and which are material to the Defendant in preparation of his defense." The record also shows that the State failed to provide this information to the Defendant before trial. On cross-examination, Agent Wilson testified that Detective Seals measured and recorded the distances between the victim's body and the door to the Defendant's home and between the victim's head and the pool of blood at the top of the embankment. The distances recorded were twenty-six and thirteen and one-half, respectively, but the unit of measurement was not listed. The Defendant was not provided with a copy of Detective Seal's measurements until Agent Wilson testified on cross-examination that such measurements were made.

With regard to the measurement between the victim's body and the pool of blood on top of the embankment, we hold that the Defendant has failed to show that this measurement was material to prove that the Defendant acted in self-defense. Agent Wilson testified that there were pools of blood at both the top and bottom of the embankment, with a trail of blood moving about halfway down the embankment. Ms. Lewis testified that her autopsy revealed that the victim was eight feet away from the shotgun when he was shot in the arm and two to four feet away when he was shot in the chest. Their testimony established that the victim was moving toward the Defendant when he was shot, a fact not in contention at trial. The measurement between the victim's body and the pool of blood on top of the embankment would do nothing to bolster this uncontroverted conclusion. The record does not reflect that there is a reasonable probability that, had this measurement been disclosed to the Defendant before trial, the result of the proceeding would have been different.

-11-

With regard to the measurement between the victim's body and the door to the Defendant's home, we hold that the Defendant has failed to show that this measurement was material to prove that the shooting occurred within the curtilage of his home. Ms. Mudica testified that she found the victim's body five or six feet from the Defendant's home. The Defendant testified that the shooting occurred within six feet of his home. Numerous photographs introduced at trial showed the location of the victim's body near the Defendant's home. In deciding on which portions of the self-defense instructions to charge the jury, the trial court accepted that the shooting occurred within the curtilage of the Defendant's home. In rejecting the self-defense instruction dealing with the use of deadly force within a home, the trial court said, "This doesn't qualify as [a] residence . . . [c]urtilage is not the residence . . . it can't apply if something happened in a yard." Because the trial court accepted, and other evidence established, that the shooting occurred within the curtilage, the record does not reflect that there is a reasonable probability that, had this measurement been disclosed to the Defendant before trial, the result of the proceeding would have been different. The Defendant is not entitled to relief on this issue.

## V

The Defendant contends the trial court erred when it declined to charge a portion of the self-defense instruction that states that a person using deadly force within his home is presumed to have had a reasonable fear of imminent death or serious bodily injury when the deadly force is used against a non-family member who enters or has entered the home unlawfully and forcibly. See T.C.A. § 39-11-611(c) (Supp. 2007) (amended 2008); T.P.I.-Crim. 40.06(b) (11th ed. 2007). The State contends that there was no error because the shooting did not occur within a residence, dwelling, or vehicle. We agree that the trial court properly declined to charge this requested instruction.

In criminal cases, the trial court has the duty to charge the jury on all of the law that applies to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992) (citing State v. Thompson, 519 S.W. 2d 789, 792 (Tenn. 1975)). The defendant also "has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." Thompson, 519 S.W.2d at 792; see T.C.A. § 39-11-203(c) (2010) (entitling a defendant to have the issue of the existence of a defense submitted to the jury when it is fairly raised by the proof). An erroneous jury instruction may deprive the defendant of the constitutional right to a jury trial. See State v. Garrison, 40 S.W.3d 426, 433-34 (Tenn. 2000).

An instruction on a defense must be given if fairly raised by the proof regardless of whether the defense relies on the theory or requests that an instruction be given as to that theory. See State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001); see also State v. Allen, 69 S.W.3d

181, 187-88 (Tenn. 2002); Alfonzo Williams v. State, No. W2008-00106-CCA-R3-PC, Shelby County, slip op. at 6 (Tenn. Crim. App. July 29, 2009) (applying the supreme court's holding in Allen to conclude that an instruction on a defense must be given if fairly raised by the proof), app. denied (Tenn. Mar. 1, 2010). "In determining whether a defense is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." Sims, 45 S.W.3d at 9 (citing Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975); State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998)); see also State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). If evidence has been presented which reasonable minds could accept as a defense, "the accused is entitled to the appropriate instructions." Johnson, 531 S.W.2d at 559.

In denying the Defendant's request to instruct the jury on the presumption of reasonableness accompanying the use of deadly force within a home, the trial court stated

> Curtilage is not the residence . . . the way I read [the self-defense statute], [it] is all dealing with structures, not dealing with just the open yard area . . . we're talking about entering into either a dwelling or a residence and that . . . does not extend to just some open area out and around, even though it may be titled in the name of the owner. . . .

Viewing the evidence in the light most favorable to the Defendant, the victim drove to the Defendant's home at midnight and attempted to sell the Defendant marijuana. The Defendant met the victim outside on the land adjoining his home and told the victim to leave. The victim threatened the Defendant and moved toward the Defendant, resulting in the Defendant shooting the victim.

We hold that the evidence did not support the jury instruction regarding the presumption of reasonableness accompanying the use of deadly force within a home. The self-defense statute states that the presumption applies to deadly force used within a "residence, dwelling, or vehicle." T.C.A. § 39-11-611(c); see T.P.I.- Crim. 40.06(b). The statute defines "residence" as "a dwelling in which a person resides . . . or any dwelling, building, or other appurtenance within the curtilage of the residence." See T.C.A. § 39-11-611(c). The curtilage itself is not defined as a part of the residence for purposes of the self-defense instruction.

We note that this court has held that the curtilage surrounding a home can constitute a part of the home for self-defense purposes. See State v. Bottenfield, 692 S.W.2d 447, 452 (Tenn. Crim. App. 1985); State v. Charles T. Edwards, No. 01-C-019007CR00171, Davidson

County, slip op. at 6-7 (Tenn. Crim. App. Aug. 30, 1991), app. denied (Tenn. Sept. 24, 1991). Although these cases involved the use of deadly force within the curtilage, each of the victims had already entered or were in the process of entering the defendant's home unlawfully. See id. In this case, the record reflects that the victim did not enter or attempt to enter the Defendant's home. The entire altercation occurred outdoors on the land adjoining the Defendant's home. As a result, the trial court properly declined to instruct the jury on the presumption of reasonableness accompanying the use of deadly force within a home. The Defendant is not entitled to relief on this issue.

**VI**

The Defendant contends that the trial court erred by considering probation violations and prior criminal convictions that were not proven by certified copies of conviction and were not disclosed to the Defendant before the sentencing hearing. At issue are a 1987 conviction for misdemeanor battery, a 1990 conviction for marijuana possession, and two probation violations. The State contends that the trial court properly considered this evidence when determining the application of enhancement factors. We hold that although one probation violation was not properly considered, each enhancement factor was proven by a preponderance of the evidence.

As a preliminary matter, we note that the convictions and probation violations at issue were not used to establish the Defendant as a Range II, multiple offender but were introduced by the state to establish enhancement factors (1) and (8). See T.C.A. §§ 40-35-114(1) (the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range); 40-35-114(8) (the defendant failed to comply with the conditions of a sentence involving release into the community). The Defendant does not argue that these enhancement factors were improperly applied or that he did not commit the offenses underlying his convictions and probation violations. He argues that the convictions and probation violations at issue should not have been considered during sentencing because they were not proven by certified copies of conviction and were not disclosed to the Defendant before the sentencing hearing.

At a sentencing hearing, the trial court must afford the parties the opportunity to be heard and present evidence relevant to the sentencing of the Defendant. T.C.A. § 40-35-209(b). The state has the burden of proving all enhancement factors by a preponderance of the evidence. State v. Gutierrez, 5 S.W.3d 641, 644 (Tenn. 1999). Reliable hearsay may be admitted at sentencing if the opposing party is accorded a fair opportunity to rebut such evidence. T.C.A. § 40-35-209(b). This court has consistently held the presentence report to be reliable hearsay. See State v. Baker, 956 S.W.2d 8, 17 (Tenn. Crim. App. 1997) (holding that the information contained in a presentence report "is reliable

because it is based upon the presentence officer's research of the records, contact with relevant agencies, and the gathering of information which is required to be included in a presentence report"). Likewise, the person who prepared the presentence report may be a witness at the sentencing hearing. T.C.A. § 40-35-209(b). Certified copies of convictions or documents are also considered reliable hearsay. Id. This court has also held that certified copies of convictions are not necessary to prove prior criminal history and that courts can rely upon the presentence report and the testimony of the person who prepared the report. See State v. Richardson, 875 S.W.2d 671, 677 (Tenn. Crim. App. 1993).

"Upon a defendant's request, the state shall furnish the defendant with a copy of the defendant's prior criminal record, if any, that is within the state's possession, custody, or control if the district attorney general knows--or through due diligence could know--that the record exists." Tenn. R. Crim. P. 16(a)(1)(E). If a party fails to comply with discovery requests, the trial court may order an inspection of the item in question, exclusion of the item, or any other remedy as deemed appropriate under the circumstances. Tenn. R. Crim. P. 16(d)(2). Although a court may order the exclusion of an item,

> evidence should not be excluded except when it is shown that a party is actually prejudiced by the failure to comply with the discovery order and that the prejudice cannot be otherwise eradicated. [Rule 16] should not be employed to frustrate justice by lightly depriving the State or the defendant of competent evidence.

State v. Garland, 617 S.W.2d 176, 185-86 (Tenn. Crim. App. 1981) (holding that although evidence was not disclosed prior to trial, it was properly submitted because there was no prejudice from nondisclosure).

Regarding the Defendant's probation violation in 1981, he had notice of it because the presentence report stated that he had a history of probation violations in Florida and listed the offenses leading to his probation in 1980 and its subsequent violation in 1981. Ms. Dotson testified that in 1981, the Defendant violated the terms of his probation by being convicted of possession of marijuana, possession of narcotic equipment, criminal mischief, and operating a motor vehicle without a valid registration. Ms. Dotson explained that she obtained this information by speaking with the circuit court clerk in Manatee County, Florida, and obtaining from the clerk a certified copy of a progress report listing the Defendant's offenses in Florida. The Defendant was accorded a fair opportunity to rebut the evidence of this violation and failed to do so. The Defendant did not contend that the presentence report or the testimony of Ms. Dotson was incorrect. As a result, the presentence report and testimony of Ms. Dotson were properly admitted by the trial court as reliable

hearsay. See T.C.A. § 40-35-209(b). A certified copy of this probation violation was not required in order to establish it by a preponderance of the evidence, and the court properly relied on the presentence report and the testimony of Ms. Dotson. See Richardson, 875 S.W.2d at 677. The Defendant is not entitled to relief on this issue.

Regarding the Defendant's probation violation in 1986, we agree with the Defendant that this violation was not properly considered during sentencing because it was not established by a preponderance of the evidence. Although the presentence report stated that the Defendant had a history of probation violations in Florida, it did not list the offense or conduct leading to his probation in 1985 or its subsequent violation in 1986. Likewise, although Ms. Dotson testified that the Defendant violated the terms of his probation in 1986, she did not state the offense leading to probation or the cause of the violation. While this probation violation was not properly considered, the probation violation occurring in 1981 was sufficient to establish enhancement factor (8) because it proved by a preponderance of the evidence that the Defendant failed to comply with the conditions of a sentence involving release into the community. See T.C.A. § 40-35-114(8); Gutierrez, 5 S.W.3d at 644.

Regarding the Defendant's prior convictions, Ms. Dotson testified that in 1990, the Defendant was convicted for marijuana possession. She said that she obtained this information from the National Crime Information Center in Phoenix, Arizona but that she was unable to obtain a certified copy of the conviction due to the expense involved in obtaining it. She said that she asked the Defendant about this conviction during the presentence interview and that he responded, "Yeah, I had some trouble with marijuana, but that was about 15 years ago." Additionally, the State introduced a certified copy of a progress report obtained from the circuit court clerk in Manatee County, Florida, reflecting that the Defendant pled guilty to misdemeanor battery in 1987.

The State concedes that these two convictions were not mentioned in the presentence report and were not provided to the Defendant before the sentencing hearing. The record does not reflect, though, any prejudicial effect from this failure. The Defendant did not deny that he had these convictions. The presentence report reflected that the Defendant was convicted of nine misdemeanors, in addition to the two felonies used to establish his Range II status and the two misdemeanors at issue. These nine misdemeanors, including convictions for assault, resisting an officer with violence, and marijuana possession, were sufficient to establish the Defendant's history of criminal behavior by a preponderance of the evidence. As a result, the State's failure to comply with the Defendant's discovery request did not prejudice the Defendant and did not warrant the exclusion of this evidence. See Garland, 617 S.W.2d at 185-86.

Furthermore, the presentence report, the testimony of the person who prepared that report, and a certified court document reflecting that the Defendant pled guilty to misdemeanor battery in 1987 were properly considered as reliable hearsay of the Defendant's prior criminal behavior. See T.C.A. § 40-35-209(b); Baker, 956 S.W.2d at 17. The Defendant was accorded a fair opportunity to rebut the evidence of these convictions and failed to do so. Certified copies of the Defendant's convictions were not necessary to prove his prior criminal history. The court could properly rely upon the presentence report and the testimony of Ms. Dotson in determining the Defendant's prior criminal history. See Richardson, 875 S.W.2d at 677 (Tenn. Crim. App. 1993). The Defendant is not entitled to relief on this issue.

## VII

The Defendant contends that the trial court imposed an excessive sentence by giving undue weight to the Defendant's prior convictions and failing to consider mitigating factors. The State contends that the trial court properly sentenced the Defendant. We agree with the State.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d) and -402(d)(2006). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing was improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

We note, though, "'the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this respect, for the purpose of meaningful appellate review, the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e).

Also, in conducting a de novo review, we must consider (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal

conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In imposing a sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210. From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Carter, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d)).

The weighing of enhancement and mitigating factors is within the sole discretion of the trial court. See Carter, 254 S.W.3d at 345. Thus,

> even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors.

Id.

-18-

The trial court found that the following enhancement factors applied pursuant to Tennessee Code Annotated section 40-35-114:

> (1) the Defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

> (8) the Defendant failed to comply with the conditions of a sentence involving release into the community;

> (9) the Defendant possessed or employed a firearm during the commission of the offense;

> (10) the Defendant had no hesitation about committing a crime when the risk to human life was high.

See T.C.A. § 40-35-114 (Supp. 2007) (amended 2008). The court assigned great weight to factors (1) and (9) and gave little weight to factor (10).

The trial court found mitigating factor (2), the defendant acted under strong provocation, applicable but assigned it little weight. See T.C.A. § 40-35-113(2). The court stated, "The only factor in his favor is he was at his place, it was an odd hour, and it was possibly obnoxious conduct by the victim, but all that together pales in light of actually shooting a man twice . . . so I'm leaving the sentence at 10 years."

The Defendant first contends that the trial court afforded undue weight to the Defendant's prior convictions and enhancement factor (1). The weighing of enhancement and mitigating factors is within the sole discretion of the trial court. See Carter, 254 S.W.3d at 345; State v. Devin Banks, No. W2005-02213-CCA-R3-DD, Shelby County, slip op. at 56 (Tenn. Crim. App. July 6, 2007) (recognizing that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts"). The record reflects that the Defendant was convicted of at least nine misdemeanors in addition to the two felonies used to establish his Range II status. The Defendant admitted owning firearms, despite being a felon. Additionally, Detective Seals

testified that he found between three and five marijuana plants growing outside of the Defendant's home and marijuana seeds inside the home. This evidence was sufficient to establish the Defendant's history of criminal convictions and criminal behavior by a preponderance of the evidence. Because the trial court properly applied enhancement factor (1), we defer to the trial court's weighing of this factor. See Carter, 254 S.W.3d at 345; Devin Banks, slip op. at 56. The Defendant is not entitled to relief on this issue.

The Defendant also contends that, despite the trial court's application of enhancement factors (1), (8), (9) and (10), and mitigating factor (2), the court failed to consider additional mitigating factors. He argues that three mitigating factors were applicable: (3) substantial grounds existed tending to excuse or justify the Defendant's criminal conduct, though failing to establish a defense; (11) the Defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct; and (13) he has been sufficiently punished by losing his job and home. See T.C.A. §§ 40-35-113(3), (11), (13).

Contrary to the Defendant's argument, the trial court did consider the above mitigating factors. The trial court rejected mitigating factor (3), stating, "There [are] some grounds [supporting the claim] that he might not have done this if the other man hadn't been somewhat provocative, but I don't think they [are] substantial . . . [if you] come out and ask somebody to leave and . . . shoot them twice . . . that's beyond the pale of excusing conduct." While the record reflects that the victim's actions were bothersome and irritating, it does not reflect that the victim's actions threatened immediate harm to the Defendant or otherwise justified the Defendant shooting the victim twice at close range with a shotgun. As a result, we conclude that the trial court properly refused to apply this mitigating factor.

The trial court rejected mitigating factor (11), stating that this factor was not met "simply because there [had] already been one confrontation. Apparently, if you just got in the area around this Defendant . . . he was . . . likely to come out and confront you . . . with a weapon, so I don't see how that's a mitigator in this case." The record does not reflect that this shooting was committed under unusual circumstances. An almost identical confrontation occurred two nights before the shooting, when the Defendant, naked and armed with a shotgun, confronted the victim for being near his home late at night. As a result, we conclude that the trial court properly refused to apply this mitigating factor.

The trial court rejected mitigating factor (13), stating that it did not find any other mitigating factors consistent with the purposes of the Sentencing Act to be applicable.

-20-

Although the Defendant contends that he has been sufficiently punished by losing his job and home, the record does not reflect the circumstances surrounding the loss of the Defendant's job or the burning of his home. As a result, we defer to the presumptively correct finding of the trial court that this factor was inapplicable. See T.C.A. § 40-35-401(d).

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____

JOSEPH M. TIPTON,  PRESIDING JUDGE