IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 6, 2012 Session

## STATE OF TENNESSEE v. TOMMY GAYDEN

**Appeal from the Criminal Court for Shelby County**
**No. 09-06131    Chris Craft, Judge**

_____

**No. W2011-00378-CCA-R3-CD  - Filed October 23, 2012**
_____

The Defendant, Tommy Gayden, was convicted by a Shelby County Criminal Court jury of second degree murder, a Class A felony. See T.C.A. § 39-13-210 (2010). The trial court sentenced the Defendant as a Range II, multiple offender to thirty years' confinement at 100% service as a violent offender. On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction, (2) the trial court erred by allowing the State to argue during opening statements that the Defendant was calm and collected at the time of the shooting, (3) the trial court erred by allowing the State to argue facts not in evidence during closing arguments, and (4) the trial court erred by not granting the Defendant's requested jury instruction. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Marvin Ballin and Richard S. Townley, Memphis, Tennessee, for the appellant, Tommy Gayden.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Chris West and Dean DeCandia, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case relates to a shooting that resulted in the death of Monoleto Robinson. At the trial, Felicia Robinson testified that she and the victim were married but separated at the time of the shooting. She had eight children. She said the victim was an involved stepfather,

even after they separated. She said the victim moved out of their home four months before his death. She said she and the victim were listed as emergency contacts at her son's school. She said that she knew the Defendant as Tommy Dickerson and that they had an "on-and-off" relationship for fourteen years, which ended on February 26, 2009. She admitted that she and the Defendant dated while she was married to the victim, while she lived with the victim, and after the victim moved out.

Ms. Robinson testified that on February 26, 2009, around noon, she was in her bedroom with the Defendant, who had stayed at her home for a few days. She said she awoke that morning at 6:00, took her children to school, returned home, and went back to sleep. She said that at noon, the victim and her son knocked on the bedroom door. She said she put on her clothes and went outside through the living room door, which opened to the back of her home. She said the victim and her son were there because her son had been suspended from school. She told the victim that her brother was coming over and that they could walk to the front of the home and wait for her brother. She said the victim asked why they could not go inside. She told the victim that she had company.

Ms. Robinson testified that the victim took her keys from her purse and went into the home. She said she and her son followed the victim into her bedroom. She stated that she heard the victim say, "[B]---- a-- n-----, are you pulling a gun?" She said that the Defendant stood in the doorway with a handgun and that the victim yelled and cursed at the Defendant. She said the victim stopped yelling and pushed her out the bedroom door. She said her son and the Defendant followed behind them outside the home. She said that the Defendant still had the gun in his hand, that the victim and the Defendant continued to argue, and that the victim told the Defendant what he was going to do to the Defendant if the Defendant put away his gun.

Ms. Robinson testified that the Defendant pushed the victim with one hand, that the Defendant "tumbled forward," and that the victim stumbled back and forth. She said that the Defendant had his back to the house when he pushed the victim and that the victim faced the house. She did not see anything in the victim's hand but said the Defendant still had the gun in his hand. She said that after the Defendant pushed the victim, the Defendant stood still, raised his arm straight, and shot the victim in the chest. She said the Defendant paused before pulling the trigger. She stated that the victim fell to the ground and that the Defendant went into the home. She said the Defendant came outside, saw the victim on the ground, said, "[S]---, man," and walked down the sidewalk. She said the Defendant never yelled at the victim. She said that she performed CPR and that her son witnessed the shooting.

On cross-examination, Ms. Robinson testified that she and the victim married on October 6, 2006. She said that she and the victim separated several times during their marriage and that she and the Defendant dated during the separation periods. She said the victim worked as a security guard after they married. She said the victim weighed about 250 pounds and was 6'2" tall and agreed he was a former high school athlete.

Ms. Robinson testified that after she told the victim that she had company, the victim choked and shook her and grabbed her clothes. She did not recall the victim's calling her names but said it was possible that he did. She said the victim did not have a key to her home or permission to be in her home. She said the victim had permission to be there once a week to spend time with the children and agreed the day of the shooting was not his visitation day. She said that the Defendant had permission to be in her home and that he arrived two days before the shooting.

Ms. Robinson testified that while she, the victim, the Defendant, and her son were in the bedroom, the victim told the Defendant that the victim was going to "f--- him up" if the Defendant put down his gun. She interpreted the victim's statement to mean the victim would fight the Defendant but did not know if the victim meant he would kill the Defendant. She said that the victim was angry and that the Defendant stood still. She said the Defendant held the gun at his side with the barrel pointed toward the floor while the victim yelled. She said the Defendant's only statement to the victim while they were in the bedroom was that "it don't have to be like this." She interpreted the Defendant's statement to mean that there was a better way to handle the situation. She said the Defendant did not seem angry.

Ms. Robinson testified that the victim pushed her by the neck and shoulders out the bedroom door and yelled at her but denied that the victim threatened her. She said the victim let her go after they were outside. She said the Defendant came outside with the gun by his side and the barrel pointed at the ground. She said the victim saw the Defendant and walked toward the Defendant. She said the victim told the Defendant that he would kill the Defendant if the Defendant put away the gun. She said the victim did not have anything in his hands and denied telling the police the victim had an umbrella. She only remembered seeing an umbrella nearby. After being confronted with her statement to the police, she agreed that the victim struck her after the victim forced her outside. She said that after the victim let her go, the victim began to leave but decided to approach the Defendant instead. She said the victim told the Defendant that the Defendant "was going to have to shoot" the victim. She said that when the victim approached the Defendant outside, the victim pointed his finger at the Defendant and yelled at him. She agreed the Defendant shoved the victim and fired his gun. She agreed the victim had his finger in the Defendant's face. She said only two feet separated them.

Ms. Robinson testified that the Defendant had a paralyzed right foot and had undergone multiple surgeries. She agreed the Defendant had difficulty with balance and said he stumbled when he pushed the victim. She agreed she tried to get the victim to leave and said the victim "kept going back" to the Defendant. She said the victim stated three or four times that the Defendant was going to have to kill the victim. She said the Defendant saw the victim grab her by the neck and push her outside, but she did not know if the Defendant saw the victim hit her while they were outside. She agreed that the Defendant pointed the gun at the victim only after the victim "got up in" the Defendant's face and that the Defendant pushed the victim away.

Ms. Robinson's son testified that he was ten years old at the time of the shooting and that the victim picked him up from school early because he had been suspended for fighting. He said the victim took him home, knocked on the door, and called for his mother. He said that his mother came outside and that the victim asked why they could not enter the home. He said that when his mother said she had company, the victim grabbed his mother's neck, took the house keys from her purse, and entered the home. He said he entered the home a few minutes after the victim. He said the Defendant was in his mother's bedroom holding a gun, pointed toward the floor. He said that the victim yelled that the Defendant should shoot the victim and that the Defendant stood still and spoke calmly to the victim.

Ms. Robinson's son testified that his mother and the victim went outside and that he followed behind. He did not recall anyone touching anyone else or the victim's having anything in his hands. He said the Defendant came outside not long after he did. He stated that although the Defendant did not say anything, the victim yelled, "[Y]ou got the gun, shoot me." He stated that the Defendant said there was another way to deal with the situation but that the victim continued to yell. He said that the victim walked away but then ran up to the Defendant and that the Defendant pushed the victim back. He said it appeared as though the Defendant pushed the victim hard because the victim was bigger than the Defendant. He said the Defendant raised the gun, paused for two seconds, and shot the victim. He said the Defendant entered the home, got his clothes, and walked down the street after the shooting. He said that the Defendant repeatedly said "dang" and that he interpreted this to mean that the Defendant did not want to shoot the victim.

On cross-examination, Ms. Robinson's son testified that the Defendant was at Ms. Robinson's home the day before the shooting. He said the victim had an umbrella the day of the shooting. He said that his mother did not want to let the victim inside the home and that the victim forced his way inside. He said the victim called his mother names and was angry. He agreed the Defendant was calm and said the Defendant stood still in the bedroom doorway. He said the victim stood in the hall and yelled at the Defendant to shoot the victim. He denied that the victim said he would harm the Defendant if the Defendant put away the

-4-

gun and that the victim threatened to hit or kill the Defendant. He said that the Defendant told the victim to calm down and that there was another way to solve the problem.

Ms. Robinson's son testified that he did not see the victim grab his mother by the neck and force her outside. He said that he went outside after the victim and his mother and that the Defendant came outside about five seconds later. He said that his mother stated that she did not want to "have anymore of this" and that the Defendant stood still and watched. He said that as the victim went to leave, the victim turned around and "rushed up" into the Defendant's face and that the Defendant pushed the victim off the Defendant. He said the victim told the Defendant that the victim was going to hurt the Defendant. He stated that he saw the victim grab his mother by the throat twice, that he worried for her safety, and that he had seen the victim grab his mother before the day of the shooting. On redirect examination, he stated that the victim had an umbrella in his hand while they walked home from his school but that he did not see the umbrella after they got home. He denied seeing the victim touch the Defendant.

Dr. Marco Ross, an expert in forensic pathology, testified that he performed the autopsy of the victim and that the victim was 6'1" tall and weighed 250 pounds. He said the victim was shot in the chest and had an entrance wound on the left upper chest wall. He concluded that the cause of death was the gunshot wound to the chest.

Memphis Police Officer Kenneth Walcott testified that when he arrived at the crime scene, he saw the victim lying in the street and secured the area. He said that before he left the scene, the police had a description of the Defendant. Memphis Police Officer Anthony Billingsley testified that he searched the area for the Defendant and that he found the Defendant in downtown Memphis the day after the shooting. On cross-examination, Officer Billingsley stated that the Defendant was arrested while at his attorney's office.

The Defendant testified that he and Ms. Robinson had dated periodically since she was eighteen years old. He said he knew she was married but separated at the time of the shooting. He denied staying at Ms. Robinson's home when she and the victim were living together. He said that on February 24, 2009, he stayed overnight at Ms. Robinson's home. He said he and Ms. Robinson always discussed in advance his coming to her home. He said that he remained at the home the following day with Ms. Robinson and stayed the night. The next day, the day of the shooting, the Defendant awoke around 9:30 or 10:00 a.m. and Ms. Robinson awoke when the victim knocked on the door around noon.

The Defendant testified that Ms. Robinson asked who was at the door, got dressed, grabbed her purse, and went outside. He said her brother planned to pick her up to run a few errands around the time the victim knocked on the door. He said he heard "a commotion"

-5-

and the victim ask why he could not enter the home. He heard Ms. Robinson tell the victim that she had company and that she did not want the victim at her home. He heard the victim and Ms. Robinson arguing for about three minutes and then someone "busting in" the home. He said he stood in the bedroom doorway and saw the victim in the hall. He said the victim said, "[Y]ou got me f----- up, you got this n----- in your house. I got your a-- . . . you got a . . . gun, you [are] going to have to use [it] with your b---- a--." He said the victim stated that if the Defendant put away the gun, the victim was going to "f--- [the Defendant] up."

The Defendant testified that he told the victim that there was "another way" to solve the problem "like gentlemen." He said the victim stated that the Defendant was not the only person who had a gun. He said the victim made a telephone call, grabbed Ms. Robinson by the neck and forced her outside. He said he looked out the window, heard the victim yelling at Ms. Robinson about the Defendant's being there, and heard the victim threaten the Defendant. He stated that he went outside, that the victim approached him, and that the victim told him that if he put away the gun, the victim would "f--- [the Defendant] up." He said the victim was four or five feet from him. He said the victim walked away, continued to yell at Ms. Robinson for having the Defendant in the victim's home, and told the Defendant, "[S]hoot, mother------, shoot." He said that the victim ran at him and that the Defendant held his arm out after the victim got too close. He said that although he had a gun in his left hand pointed at the ground, he had not pointed the gun at the victim. He said he only pointed the gun at the victim when he shot the victim. He said the victim was a large man and bigger than he was. He said that at the time of the shooting, he was 5'9" tall and weighed about 200 pounds, and the victim was 6'1" tall and weighed 250 pounds.

The Defendant testified that he shot the victim because he feared being hurt by the victim. He said, "If the opportunity presented itself[,] I just knew this man, after this display, . . . was going to hurt me. Possibly kill me." He said he did not mean to shoot the victim. He said he grabbed his belongings and left. He denied intentionally or knowingly killing the victim. He said he shot the victim because he was in fear for his life.

On cross-examination, the Defendant testified that he never met the victim before the shooting, although he knew the victim was Ms. Robinson's husband. He said his cell phone was on the dresser in Ms. Robinson's bedroom. He agreed he knew it was the victim knocking on the door and said he did not know what the victim was going to do if he saw the Defendant in Ms. Robinson's bedroom. He said he wanted to leave the home but stayed in the bedroom in shock that the victim was there. He said he did not know what he faced outside if he left the home. He said he grabbed his gun when he heard the victim and Ms. Robinson outside "scuffling." He said that when the victim first saw the Defendant, the victim was about ten to twelve feet from the Defendant. He said the victim came into the bedroom and stood in the middle of the room about four or five feet from the Defendant. He

denied saying anything to the victim other than that there was a better way to solve the problem.

The Defendant testified that he had been at the home frequently and was familiar with most of the home's layout. He agreed he knew where the doors were located. He said that after the victim pushed Ms. Robinson out the door, he looked out the window to check on her safety. He said he heard the victim and Ms. Robinson but could not see them. He said he went outside and walked to where he could see the victim and Ms. Robinson. He said he did not call the police or call anyone for help. He stated that he stood in the driveway during the incident and that although he wanted to leave, he stayed because he feared what the victim would do to Ms. Robinson. He said that while he was outside, he only spoke when the victim addressed him. He denied saying anything other than they needed to solve the problem another way and denied speaking to Ms. Robinson.

The Defendant testified that he knew how a gun worked and that he did not know where he aimed the gun when he shot the victim. He denied yelling during the incident and said he entered the home after the shooting to get his belongings. He denied calling the police or an ambulance and said he walked through the yard when he left. He agreed he walked past the victim, who was lying on the ground, and said he did not attempt to help the victim, call the police, or wait for the police to arrive. On redirect examination, the Defendant testified that he put his gun in his pants pocket when the victim knocked on the door and identified himself.

Upon this evidence, the jury convicted the Defendant of second degree murder. The trial court sentenced the Defendant to thirty years' confinement. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to support his conviction in light of his acting upon a well-founded fear of death or serious bodily injury, or alternatively, because he acted in a state of passion based on adequate provocation. He argues that no reasonable jury could have failed to find that he acted in self-defense because of his fear and the victim's threats. Alternatively, the Defendant argues that his conviction should be reduced to voluntary manslaughter because he was in a state of passion produced by adequate provocation. The State contends that the evidence is sufficient and argues that the jury rejected the theories of self-defense and acting under adequate provocation. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S .W.2d 651, 659 (Tenn. 1997).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The jury decides the weight to be given to circumstantial evidence and "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958) (quoting 2 Wharton's Criminal Evidence 1611). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this appeal, second degree murder is defined as the knowing killing of another. T.C.A. § 39-13-210(a)(1) (2010). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. at § 39-11-302(a). "When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally." Id. at § 39-11-301(a)(2) (2010). "[A] person acts intentionally with respect to the nature of the conduct or to a result of conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. at § 39-11-302(a) (2010).

In Tennessee,

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if: (A) The person has a reasonable belief that there is an imminent danger of death or

serious bodily injury; (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and (C) The belief of danger is founded upon reasonable grounds.

Id. at § 39-11-611(b)(2)(A)-(C). Whether a defendant acted in self-defense is a question of fact for the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). When determining whether a defendant acted in self-defense, a jury must consider "whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995).

The jury's verdict reflects that it rejected the Defendant's claim of self-defense. Taken in the light most favorable to the State, although the victim was angry with the Defendant for being in his wife's home and yelled at the Defendant and Ms. Robinson, there was no evidence that the victim touched the Defendant. Ms. Robinson testified that the victim only put his finger in the Defendant's face and that approximately two feet separated the victim and the Defendant. Although the victim told the Defendant that he would harm the Defendant if the Defendant put away his gun, the Defendant grabbed his gun when the victim identified himself at the door and held it in his hand until the shooting. The Defendant testified that he shot the victim while the victim was unarmed. Ms. Robinson and her son testified that after the Defendant pushed the victim, the victim stumbled back and forth, that the Defendant raised his arm straight, and that the Defendant shot the victim in the chest after a brief pause.

With regard to reducing the Defendant's conviction to voluntary manslaughter, we conclude that the proof does not support such a reduction. "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a) (2010). Whether a killing results from "adequate provocation" is a question of fact for the jury. State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).

The jury's verdict reflects that it rejected the theory that the Defendant acted under adequate provocation. In the light most favorable to the State, Ms. Robinson testified that the Defendant did not seem angry and did not yell at the victim or raise his voice during the incident. Ms. Robinson said that the Defendant only said to the victim that "it don't have to be like this." Ms. Robinson's son testified that the Defendant was calm and did not move while the Defendant and the victim were inside the home. Ms. Robinson's son said that the

Defendant calmly told the victim to calm down and that there was another way to solve the problem. He stated that after the Defendant, the victim, and Ms. Robinson went outside, the Defendant watched the argument between Ms. Robinson and the victim and did not move. The Defendant denied yelling during the events leading to the shooting. After the shooting, the Defendant entered the home, gathered his belongings, and walked down the street before the paramedics and police arrived. We conclude that the evidence supports a finding that the Defendant was calm during the incident.

We conclude that a rational trier of fact could have found the elements of second degree murder beyond a reasonable doubt, that the Defendant failed to act under adequate provocation, and that the evidence is sufficient to support the Defendant's conviction for second degree murder.

## II

The Defendant contends that the trial court erred by allowing the State to say during opening statements that he was calm and collected. He argues that the statements were made in bad faith and with the intent to prejudice the jury against him and that the court gave an inadequate curative instruction. The State responds that the comments were not improper and that the Defendant is not entitled to relief. We agree with the State.

During the State's opening statement, the prosecutor discussed the circumstances of the victim's finding the Defendant in Ms. Robinson's home. The prosecutor said that the victim was upset after finding the Defendant in his wife's home, that an argument occurred between the victim and the Defendant, and that the Defendant had a firearm in his hand. The prosecutor said that the victim did not touch the Defendant but that the Defendant pushed the victim to the ground. The prosecutor said the victim stumbled, and the Defendant "calmly, collective [sic] raised his gun." Defense counsel objected on the ground that the prosecutor did not witness the Defendant and the victim's argument and did not know if the Defendant was calm, cool, and collected.

The trial court instructed the jurors that neither the prosecutors nor defense counsel were present during the argument in question but could discuss what they expected the evidence to show during the trial. The court told the jury that opening statements were not evidence but rather a "guide to help . . . place witnesses in context." The court allowed the prosecutor to argue inferences that could be made from the expected direct and circumstantial evidence and allowed defense counsel to do the same. The prosecutor said the Defendant was calm and collected once more during his opening statement.

"In all actions of a . . . criminal nature tried before a jury, all parties . . . shall have the right prior to the presentation of any evidence . . . to make an opening statement to the court and jury setting forth their respective contentions, views of the facts and theories . . . ." T.C.A. § 20-9-301 (2009). Opening statements "are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove." Harris v. Baptist Mem'l Hosp., 574 S.W.2d 730, 732 (Tenn. 1978). Opening statements are not stipulations or evidence. Id. The scope of opening statements is within the discretion of the trial court and limited by ethical obligations of counsel. See U.S. v. Poindexter, 942 F.2d 354, 360 (6th Cir. 1991); State v. Green, 613 S.W.2d 229, 234 (Tenn. Crim. App. 1980) (declining to hold that a prosecutor's comment during opening statement that the defendant confessed to the offenses in which he was charged was improper).

We conclude that the trial court did not err by allowing the State to comment that the Defendant was calm and collected at the time of the shooting. The State told the jury and the court its theory of the case and what the expected proof would establish over the course of the trial. The prosecutor told the jury that the Defendant was calm and collected at the time of the shooting to establish that the Defendant knowingly killed the victim and not under adequate provocation or in self-defense. The evidence established that Ms. Robinson and her son said the Defendant was calm during the argument and at the time of the shooting. The prosecutor's statement was not improper.

### III

The Defendant contends that the trial court erred by allowing the State to argue facts not in evidence during closing arguments. He argues that the prosecutor's statements regarding the effect of the shooting on Ms. Robinson's son were prejudicial in that they led to the inference that the Defendant was "more guilty" of second degree murder because the shooting occurred in the presence of a child. The State responds that the trial court did not err and that the trial court gave an adequate curative instruction.

During closing argument, the prosecutor told the jury to think about Ms. Robinson's son and the trauma he experienced after watching his stepfather being killed. The prosecutor said,

> [Ms. Robinson's son] had to watch while . . . his
> stepfather stumbled backwards, just stood in shock, in shock,
> and just stood there and with a pause while . . . this defendant,
> who was not his stepfather, . . . stood there stared down his

stepfather from that distance and just pointed a gun, aimed at his chest and blasted him dead.

And I want you to think about that kind of trauma at that age. And I want you to think about the kind of coping and adjusting that he would [have] had to do then and for the last couple of years. And I want you to think about . . . his attempt to cope as a ten year old boy with this. [And to] . . . make sense of this, [he thought] that the defendant didn't want to do what he had to do. And for a ten year old that's got to cope with sort of thing –

The Defendant objected on the ground that the State's comments were an attempt to prejudice the jury against him. Defense counsel stated that the comments had no merit and were not supported by the proof. The trial court noted that the Defendant was not charged with child abuse and prohibited the State from discussing the image of a suffering child. The court gave the following curative instruction:

The State has a right to discuss . . . the impact this had on the child at the time . . . . Only no one is charged with doing anything bad to the child. You're not to . . . convict the defendant because of the child that was there, that's not one of the elements.

You can consider impact on a child seeing something like that if you so find those facts in deciding the credibility of the child's testimony. . . . [T]he criteria for credibility one of them was their means of knowledge, their motive to swear to a falsehood or tell the truth, and things like that. How they observed. You can consider all that. And in considering any witness' testimony you consider their state of mind at the time they see these things.

But [the prosecutor] does not mean to tell you, and I'm telling you, that somehow this defendant is more guilty or less guilty because something that happened might of [sic] had effect on a child. There has been no charge of any kind of child abuse or anything like that.

-12-

So keeping that in mind, I'm going to allow [the prosecutor] to talk to you about what . . . to think if the evidence shows certain things that child may have – that it may have [affected] the child's viewing of the scene and his testimony. But other than that you can't go further and talk about any adverse effects this might of had or might not of had on a child.

Our supreme court has stated that "closing arguments are a valuable privilege that should not be unduly restricted." Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). The State and the Defendant "must both be given the opportunity to argue the facts in the record and any reasonable inferences that may be drawn therefrom." State v. Seay, 945 S.W.2d 755, 763 (Tenn. Crim. App. 1996). "Argument[s] must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). There is "greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments." Terry, 46 S.W.3d at 156. A trial court's decision regarding closing arguments will be reversed only upon an abuse of discretion. Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975).

When a statement made during a closing argument is improper, "the test for determining if reversal is required is whether the impropriety 'affected the verdict to the prejudice of the defendant.'" State v. Cribbs, 967 S.W.2d 773, 783 (Tenn. 1998) (quoting Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965)). The factors to consider include the conduct at issue viewed in light of the facts and circumstances of the case, any curative actions by the trial court, the intent of the prosecutor's improper statement, the cumulative error of the improper statement and any additional errors in the record, and the strength or weakness of the case. Id.

We note the Defendant did not request a mistrial after lodging his objection to the prosecutor's statements. The prosecutor's statements about the impact of the killing on Ms. Robinson's son were not based on evidence presented at the trial and were improper. The statements stressed the impact of the victim's death on Ms. Robinson's son to engender sympathy for him and anger for the Defendant. Although the court provided the jury with an immediate instruction that the impact of the murder on Ms. Robinson's son could not be used to determine the Defendant's guilt or innocence, the instruction did not address the Defendant's concern that the statement would engender sympathy for Ms. Robinson's son and anger toward the Defendant, causing the jury to render a guilty verdict.

We cannot conclude, though, that the State's argument more probably than not affected the outcome of the trial. See T.R.A.P 36(a). The Defendant shot and killed an unarmed man. Although the victim yelled at the Defendant after finding the Defendant in his wife's home, there is no evidence that the victim touched the Defendant. The Defendant grabbed his gun upon the victim's identifying himself outside the door. After the argument ended inside the home and the Defendant and the victim were outside, the Defendant pushed the victim, who stumbled. The Defendant paused for a couple of seconds, raised his arm, and shot the victim in the chest. Ms. Robinson stated that Defendant was calm, was not angry, and never raised his voice during the argument. The Defendant is not entitled to relief.

**IV**

The Defendant contends that the trial court erred by not granting his request for an instruction regarding the statutory presumption that he held a reasonable belief of imminent death or serious bodily injury when deadly force was used against someone who entered the home unlawfully and forcibly. See T.C.A. § 39-11-611(c) (Supp. 2012); T.P.I.- Crim. 40.06(b) (11th ed. 2007). He argues that the driveway on which he stood while outside satisfies the definition of an appurtenance within the self-defense statute and justified the instruction. The State responds that the trial court did not err and argues that the Defendant was not entitled to the instruction because the shooting did not occur inside the home. We agree that the trial court properly declined to include the requested instruction.

In criminal cases, the trial court has the duty to charge the jury on all of the law that applies to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992) (citing State v. Thompson, 519 S.W. 2d 789, 792 (Tenn. 1975)). The defendant also "has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." Thompson, 519 S.W.2d at 792; see T.C.A. § 39-11-203(c) (2010) (entitling a defendant to have the issue of the existence of a defense submitted to the jury when it is fairly raised by the proof). An erroneous jury instruction may deprive the defendant of the constitutional right to a jury trial. See State v. Garrison, 40 S.W.3d 426, 433-34 (Tenn. 2000).

An instruction on a defense must be given if fairly raised by the proof regardless of whether the defense relies on the theory or requests that an instruction be given as to that theory. See State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001); see also State v. Allen, 69 S.W.3d 181, 187-88 (Tenn. 2002); Alfonzo Williams v. State, No. W2008-00106-CCA-R3-PC, slip op. at 6 (Tenn. Crim. App. July 29, 2009) (applying the supreme court's holding in Allen to conclude that an instruction on a defense must be given if fairly raised by the proof), perm. app. denied (Tenn. Mar. 1, 2010). "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the

defendant to determine whether there is evidence that reasonable minds could accept as to that defense." Sims, 45 S.W.3d at 9 (citing Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975); State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998)); see also State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). If evidence has been presented which reasonable minds could accept as a defense, "the accused is entitled to appropriate instructions." Johnson, 531 S.W.2d at 559.

Tennessee Code Annotated section 39-11-611(c) (Supp. 2012) states,

> Any person using force intended or likely to cause death or serious bodily injury within a residence . . . is presumed to have held a reasonable belief of imminent death or serious bodily injury to self, family, a member of the household or a person visiting as an invited guest, when that force is used against another person, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence . . . and the person using defensive force knew or had reason to believe that an unlawful and forcible entry occurred.

The statute defines residence as "a dwelling in which a person resides, . . . or is visiting as an invited guest, or any dwelling, building or other appurtenance within the curtilage of residence." Id. § 39-11-611(a)(4); see T.P.I.- Crim. 40.06(b). Curtilage is defined as "the area surrounding a dwelling that is necessary, convenient and habitually used for family purposes and for those activities associated with the sanctity of a person's home." Id. § 39-11-611(a)(2). The curtilage itself is not defined as a part of the residence for purposes of the self-defense instruction. State v. Kenneth Meyer, No. E2009-02294-CCA-R3-CD, slip op. at 13 (Tenn. Crim. App. Nov. 16, 2010), perm. app. denied (Tenn. Apr. 13, 2011).

The trial court found that the Defendant stood in the yard while outside the home, although the State and defense counsel agreed that the Defendant stood on the driveway of the home. The court found that although the Defendant was in the curtilage of the home at the time of the shooting, the Defendant was not in the dwelling, residence, building, or appurtenance. The court noted that Black's Law Dictionary, Seventh Edition, defined an appurtenance as "something that belongs to or is attached to something else." The court said the dictionary stated that a garden was an appurtenance to the land. The court concluded that had the Defendant stood in a garden or hid behind a tree, "maybe an appurtenance was something . . . he was defending."

In the light most favorable to the Defendant, the victim entered the home forcibly and without Ms. Robinson's consent. The Defendant heard the victim and Ms. Robinson arguing outside about why she did not allow the victim to go inside. The Defendant heard a "commotion" and someone "busting in" the home. The evidence shows, though, that the victim left the home without touching the Defendant. At this point, the unlawful entry into the home had ended. We note that this court has concluded that the curtilage surrounding a home can constitute a part of the home for self-defense purposes. See State v. Bottenfield, 692 S.W.2d 447, 452 (Tenn. Crim. App. 1985); State v. Charles T. Edwards, No. 01-C-019007CR00171, slip op. at 6-7 (Tenn. Crim. App. Aug. 30, 1991), reh'g denied (Sept. 24, 1991). In Bottenfield and Charles T. Edwards, each of the victims had already entered or was in the process of entering the defendant's home unlawfully when deadly force was used within the curtilage. See id. By contrast, in Kenneth Meyer, this court concluded that the statutory presumption was not warranted when the defendant shot the victim after fighting on the land adjoining the defendant's home. Slip op. at 13. In State v. Mark Hines, No. W2009-00450-CCA-R3-CD, slip op. at 2, 15 (Tenn. Crim. App. Oct. 27, 2010), perm. app. denied (Tenn. Apr. 14, 2011), the defendant invited the victim into his home and an argument ensued. The victim pushed the defendant and decided to leave the home to avoid any further escalation. The victim, who was unarmed, walked to the driveway. The defendant attempted to punch the victim but missed, and the victim struck the defendant in the abdomen. The defendant went inside his home, retrieved a gun, and shot the victim multiple times. This court concluded that the trial court did not commit plain error by failing to include the presumption in the jury instructions and that any imminent threat had ended before the shooting. Here, although the victim entered the home unlawfully, the victim left the home and the imminent threat ended. The physical contact between the Defendant and the victim occurred outdoors on the land adjoining the home. We conclude that the trial court did not err by declining to instruct the jury on the presumption.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE