STATE of Tennessee, Appellee,

v.

Leaf BOTTENFIELD, Appellant.

Court of Criminal Appeals of Tennessee,
at Knoxville.

Feb. 4, 1985.

Kimberly Lynn Ann Hattaway, Asst. Atty. Gen., Nashville, David G. Ballard, Dist. Atty. Gen., Charles D. Dungan, Asst. Dist. Atty. Gen., Maryville, for appellee.

F.D. Gibson, III, Nancy Bohleber, Maryville, for appellant.

## OPINION

RICHARD R. FORD, Special Judge.

The appellant appeals as of right from her conviction of voluntary manslaughter by the use of a firearm, and from the court adjudged unprobatable sentence of two years enhanced to seven years confinement in the State penitentiary. We reverse the judgment and dismiss the case.

The indictment charged second degree murder, and alleged that on the 30th day of June, 1983, Leaf Bottenfield, did maliciously and willfully kill Todd Coulter by the use of a deadly weapon, to wit, a pistol. The appellant entered a plea of not guilty, but at the trial she did not deny the shooting of the alleged victim. She relied upon her defenses of self-defense, defense of another, and defense of home and habitation. The appellant was found guilty of the lesser included offense of voluntary manslaughter by the use of a deadly weapon, a pistol. We have determined from our review of the record that the adduced trial evidence of this unique case raised factual issues pertinent to each of the asserted defenses.

We have paraphrased the appellant's alleged grounds of appeal. She insists (1) that the evidence was insufficient to support the verdict; (2) that the trial court erroneously refused to give a tendered special instruction to the jury on defense of home and habitation; (3) that absent any pre-trial notice by the State, the indictment was insufficient to put the appellant on notice of enhancement of punishment (T.C.A. § 39–6–1710); (4) that T.C.A. § 39–6–1710 was unconstitutionally applied; (5) that the trial court erred in determining that the appellant is a standard offender rather than an especially mitigated offender; and (6) that the trial court erred in ruling that by reason of T.C.A. § 39–6–1710, it was without jurisdiction to suspend the appellant's sentence.

In our determination of the sufficiency of the evidence issue we have carefully reviewed all the evidence adduced at trial. The State's proof in chief was presented by five witnesses consisting of two lads, Steve Bailey and Tony Coffman; two officers, Sergeant Mike Johnston and Detective Johnny Tindell; and Dr. Raymond Finney, Jr., a pathologist. There are no significant conflicts in the eyewitness accounts related by young Steve Bailey and his playmate, Tony Coffman. Nor is there any significant challenge to the investigative findings of Sergeant Johnston and Detective Tindell. The cause-of-death testimony of Dr. Finney was not disputed.

The appellant's witnesses consisted of herself, her step-father; Dean Cantrell, her mother, Shirley Cantrell; a neighbor, Mary Jennings, and Detective Johnny Tindell. Through these witnesses the appellant sought to further establish her defenses of self-defense, her defense of her mother, and her defense of home and habitation.

On the evening of June 30, 1983, Sergeant Johnston of the Maryville Police Department received a 9:45 p.m. disturbance call, and within three minutes he arrived at the Alva Dean Cantrell apartment situated in a HUD apartment complex. The occupants of the apartment also included Cantrell's wife, Shirley Cantrell, and his two step-daughters, Michael Bottenfield, a minor, and the appellant, Leaf Bottenfield, age 19.

On arrival at the scene Sergeant Johnston observed that one of his officers was already there; that several people were standing in the Cantrell front yard, and that the body of Todd Coulter was lying in the yard. A holstered .25 caliber automatic was found near the body. Sergeant John-

ston made exact measurements from which he prepared a diagram. Photographs were also made of the scene. Both the diagram and the photographs show that the body was lying in the grass at a point where the entrance sidewalk intersects with another sidewalk running parallel with the front of the Cantrell apartment and contiguous with the front porch. The body was lying within nine feet of the apartment and within 20 feet of the front door. Typical of apartment housing areas, the rectangular yard is of modest dimensions.

Steve Bailey, a sixth grade student, testified that he was outside playing with his friend, Tony Coffman, and others when he heard some fighting. He looked into the Cantrell yard where he saw Todd Coulter on top of Dean Cantrell beating his head on the ground. Steve Bailey watched as Shirley Cantrell and her two daughters, Michael and Leaf Bottenfield, the appellant, went to the rescue of Dean Cantrell. The mother and her two daughters pulled Coulter off Dean Cantrell as they yelled at Coulter to go away and leave them alone. Dean Cantrell went into the apartment but Coulter continued to fight and fought the mother and daughters, hitting each of them. They fought for approximately five minutes as they tried to evict him from the yard. Coulter, staggering, then went out to the street and started to sit down but did not. The mother and daughters then went to their front porch and Michael went into the apartment. Young Bailey said that he got closer and heard the mother tell Leaf, the appellant, to go get the gun, and, "If he gets in the yard, shoot him."

Continuing his testimony Steve Bailey said that Leaf went into the house, stayed about 30 seconds and returned with the gun as Coulter walked up the sidewalk leading to the apartment. Leaf stepped off the porch about three feet into the yard and told the approaching Coulter, "You son of a bitch. If you get in my yard, I'm going to shoot you." She pointed the gun at him, and he looked like he was walking away, but that he turned around, stepped into the yard and approached within six feet of her before she fired the first time.

Coulter laughed and said that it did not hurt. He also said something to the effect that he was going to take that "pea shooter" away from her. Then Coulter ran angrily at her and it looked as if he was going to grab her. She was then backing up and shooting. She shot about five or six times, and after the last shot was fired Coulter fell near her. Steve Bailey then ran.

Tony Coffman, a seventh grade student and playmate of Steve Bailey, testified essentially to the same facts. He added that in addition to seeing Coulter, he saw another man in a white van parked out in the street. Young Coffman supplied the further information that during Coulter's fight with the mother and daughters, he had Leaf down on the ground hitting her, and that her mother and Michael got him off Leaf. Coulter then went across the street while the van was still there; that after a few minutes the van left. Tony Coffman also said that after Leaf fired the first shot there was a lapse of two or three seconds and then she emptied the gun at Coulter who then fell. Tony then left with his friend, Steve. Before the State rested its case it was stipulated that the blood alcohol tests of the appellant, and of Todd Coulter, the deceased, revealed that the appellant had a zero alcohol content, and that the deceased had a twenty-six hundredths of one percent (.26) blood alcohol level.

The appellant's first witness, Dean Cantrell, described by his wife as a crippled man, gave his account of the fateful evening. He testified that he was sitting in his living room, watching television with his wife and step-daughter, Leaf, while Michael was asleep in the bedroom. Todd Coulter, an acquaintance of 15 or 20 years, came to the front door, refused an invitation to come in, and asked Cantrell to step outside. Cantrell explained that he and Coulter had had some deals and that he had owed Coulter three hundred ($300) dollars since 1981. When Cantrell went out to the porch, Coulter said, "It's pay up time." Cantrell related that Coulter then "started swinging on me and got me down on the

ground." After attacking Cantrell on his front porch, knocking over flower pots and chairs, the fight spread into the yard where Coulter had Cantrell down, beating him. Cantrell yelled for help, and his wife and two step-daughters, Michael and Leaf, went to his assistance. Cantrell said that his wife and step-daughters pulled Coulter off him, and that he, Cantrell, ran into his apartment, and with some difficulty, called the police. While he was on the telephone for some three to five minutes, he saw Leaf come in and go out again.

Thereafter, Cantrell heard a shot, got off the phone "real fast" and went outside. There he saw that Leaf was "standing right next to the bush in front of our house and my wife on the ground and Todd Coulter coming towards Leaf." The witness said that he then heard a series of shots and saw Coulter "walking fast and had his hands reaching for her trying to get her." Cantrell did not remember what they were saying. Coulter fell face down onto the ground about five to seven feet from Leaf, who dropped the gun and commenced screaming. Cantrell then helped his injured wife into the apartment. He said that Leaf was hysterical and that both she and his wife were taken to the hospital where his wife was found to have a broken leg.

The appellant's mother, Shirley Cantrell, testified that she and her children did not know Coulter. She reviewed the events of the evening and told the jury how she and her two daughters pulled Coulter off her husband; that when they did so, Coulter grabbed Leaf and had her down on the ground "beating her in the side of the head with his fists" as he kept repeating an obscenity to her. Shirley Cantrell then related that she grabbed him around the throat, pulled him loose and that they toppled over backwards with Coulter falling on top of her which caused a sharp pain in her leg. As she lay on the ground Coulter got to his feet and commenced kicking her in the sides and on her legs. The fight continued as the two women tried to get away. He had grabbed Leaf by the shirt and when it ripped, he staggered backward

into the street. The witness further related that she dragged her injured leg as she and Leaf moved backwards towards their apartment. The witness explained that she was aiming for her front porch, but did not quite make it; that she collapsed on the sidewalk near the bush.

Continuing her testimony, Shirley Cantrell said that she watched as Coulter paced back and forth in front of her apartment; that he came back into the yard toward them, laughing a sick laugh. Being fearful that Coulter would again get a hold of Leaf, the witness said she was crawling across the sidewalk, nearest the porch, dragging her leg, in an attempt to get between Coulter and Leaf. The witness said that she begged Coulter to leave, and that she heard Leaf begging him to leave; that Leaf kept telling Coulter that the cops would be there any minute; that Dean had called the cops and that they were on the way. The witness related that Coulter told Leaf that she might as well give him that pea shooter because when he got through there was not going to be a mother blanking one of them left alive. The witness described Coulter's final moments of confrontation as follows:

> It was sort of to the left of me and a little above me, and, uh, I saw the—I was watching him. I wasn't really—I wasn't looking at Leaf or the gun. I was looking at Todd to see what his reaction was going to be. I saw the dirt fly up where the first bullet hit the ground to the right of his feet. He just—he, he—his laugh got louder then like it was, you know, a game. He was really like he was enjoying it. He wasn't a bit scared. And, uh, Leaf—when she fired into the ground then, he still didn't stop and she told him she said I'm warning you again and she took a step backward or a couple of steps backward. I don't know. She fired at him again. I don't know if it hit him or not. He didn't, he didn't hesitate at that time. She saw that he—we saw that he was coming on. She fired again, and he hesitated that time, but he was still laughing. And he just kept coming

and laughing and I don't know how many shots were fired. I don't know how many hit him or anything else. I remember him laughing and coming toward us and then he fell forward onto the—on the face—on his face on the ground, and he was close enough to touch Leaf then and I was screaming at her to get back.

Testifying in her own behalf the appellant recounted the rescue efforts and described Coulter's violence and the beatings he inflicted upon the members of her family. She related that she left her yard to get the gun after she saw her mother lying on the ground and screaming about her leg. The appellant said that on her return with the gun she went to her mother, who was then lying on the sidewalk leading to the porch. As Coulter approached them she stood near her mother. The appellant described the fatal encounter. She said that Coulter threatened to take the "peashooter," and that there would not be any of us left when he finished. She said that he kept coming, and that she told him the law would be there any minute, any second, and that she repeatedly begged him to leave. The appellant said that she was fearful of Coulter, that she feared he would again hurt her mother, and that he would break into the house. She fired a warning shot with the result that "he just started laughing that much more and started coming at me at a faster pace, and I, I fired again but I don't remember after that." The appellant said that she is five feet, two inches (5′2″) in height and that she weighed one hundred and five (105) pounds. She said that Coulter was more than six feet in height, and that he was neither real husky nor skinny.

Mary Jennings, a neighbor, also witnessed the shooting. She testified that she heard a lady hollering, "Please just go on, go on, please." She said that after the first shot Coulter kept walking; that she heard someone begging him to go on, but that he kept walking; that the gun went off and he walked a little bit more and stopped, grabbed his stomach, and kept walking; that the gun went off again and he fell over; that everything went blank

for a few seconds, then she went to the assistance of Mrs. Cantrell. When called as a defense witness, Detective Johnny Tindell acknowledged that the appellant had freely cooperated and had given him a statement on the morning following the shooting.

■ On the sufficiency of the evidence issue we have accorded the State the strongest legitimate view of the trial evidence and all reasonable inferences which may be drawn therefrom as we are required to do (*State v. Cabbage*, 571 S.W.2d 832 (Tenn.1978)), and considering the evidence in the light most favorable to the State (*State v. Tuggle*, 639 S.W.2d 913 (Tenn.1982)), we conclude that the evidence presented a classic case of justifiable homicide, whether based on the appellant's defense of self-defense, the defense of her injured mother, the defense of her home and habitation, or by any combination thereof. The evidence, in our view, is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt. *See* Rule 13(e), Tennessee Rules of Appellate Procedure. We have determined that the evidence preponderates against the verdict of the jury. Where the evidence preponderates against the verdict of the jury it cannot stand. *Davis v. State*, 577 S.W.2d 467, 468 (Tenn.Cr.App.1978).

Next, we have considered the appellant's assertion that the trial judge erroneously declined to include the law of defense of home and habitation in his instructions to the jury. This case presents the unique evidentiary situation wherein factual issues of self-defense, defense of another, and defense of home and habitation are all present. In addition to his attack of the appellant and her mother, Coulter threatened the remainder of the family, some of whom were inside the home; further, Coulter was then within nine feet of the home and within 20 feet of the door as he renewed his violent assault. He ignored the pleadings of the appellant and her mother that he leave the premises. He laughed at

the warning shot and continued his senseless assault.

The appellant's specially requested jury instruction repeats the language of § 36.04 of Tennessee Pattern Jury Instructions—Criminal, which provides:

Included in the defendant's plea of not guilty is his plea that he was acting in defense of his home or habitation.

When an assault or an attempted forcible entry is made against a home or habitation under such circumstances that would create in the mind of a lawful occupant a well-founded and reasonable belief that he is in present and imminent danger of death or great bodily harm at the hands of the attacker or that the attacker intends to commit a felony therein, then a lawful occupant of a dwelling can use such reasonable force as is necessary, including deadly force, to prevent the intrusion.

*A person has the right to protect his own house and family, and to preserve peace and good order in his own house, and he has the right to use reasonable force to eject therefrom those who are drunken, disorderly, and dangerous. If while engaged in his duty, he is beset or menaced, he is entitled not only to the right of self-defense, but he may use such force as may be necessary to protect himself and family and to eject the intruder from his house.*

A person is under no duty to retreat in his own home, even if he can safely do so, but may stand his ground and use reasonable force to prevent or stop an invasion of his home or habitation.

In determining whether the defendant's use of force in defending his home or habitation was reasonable, you may consider not only his actual use of force but also all the facts and circumstances leading up to it. Also, it is proper for you to consider the relative size and strength of the parties, and whether and how they were armed.

If, from all the facts and circumstances in the case, you find that the defendant was acting in the necessary defense of his home or habitation, or if you have a reasonable doubt whether he acted in the necessary defense of his home or habitation, then you must acquit the defendant. (Emphasis added.)

The law of excusable homicide requires that the defendant must have employed all means reasonably in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life. This requirement includes the duty to retreat, if, and, to the extent, that it can be done in safety. *State v. Kennamore,* 604 S.W.2d 856 (1980). However, a person is under no duty to retreat in his own home, even if he can safely do so, but may stand his ground and use reasonable force to prevent or stop an invasion of his home or habitation. *Morrison v. State,* 212 Tenn. 633, 371 S.W.2d 441 (1963); *State v. Foutch,* 96 Tenn. 242, 34 S.W. 1 (1896). One's own home or dwelling includes the curtilage thereof. *See Conley v. State,* 38 Alabama App. 618, 92 So.2d 7, 9 (Ala.1956). While a person assaulted in his own home is not bound to retreat, his right to invoke the doctrine of defense of home and habitation depends upon his being without fault in bringing on the difficulty. See 40 Am.Jur.2d, Homicide, § 167 (1968). It is undisputed that whatever the appellant did, she did it on her own premises. It was also stipulated that blood alcohol tests revealed that the appellant had a zero blood alcohol level, and that the deceased had a blood alcohol level of twenty-six hundredths of one percent (.26), or more than two and one-half times the ten-hundredths of one percent (.10) level which creates the presumption that the person is under the influence of an intoxicant.

That the appellant killed the deceased was undisputed; thus, jury instructions bearing on the issues of self-defense, defense of another, and defense of home and habitation, including the language above emphasized, were essential for the jury's deliberations. On the evidence adduced the trial judge's one-sentence instruction on the law of defense of home

and habitation was too limited and constituted reversible error.

■ There is no merit to the appellant's asserted issue that absent any pre-trial notice by the State, the indictment was insufficient notice of T.C.A. § 39–6–1710 enhancement of punishment. Where the indictment itself, as in this case, charges the use of a firearm in the commission of a crime, the accused *is* on notice that if convicted of the alleged crime, accomplished by the use of a firearm, the enhancement provided in T.C.A. § 39–6–1710(a)(1) applies. *See State v. Hudson*, 562 S.W.2d 416, 419 (Tenn.1978). Of course, it does not apply where a proscribed offense already prescribes an enhanced punishment for the offender. *Id.*, 419.

■ Next, we find there is merit to the appellant's contention that the trial court erroneously held that the five years enhancement sentence was not subject to the Criminal Sentencing Reform Act of 1982. Recently, Presiding Judge Mark A. Walker, writing for this Court in the unreported case of *State v. Comer*, Madison Criminal, C.C.A. No. 8, filed at Knoxville on May 17, 1984, held that for an offense committed subsequent to July 1, 1982, the effective date of the Tennessee Criminal Sentencing Reform Act, it was error for the trial court to order that the five-years enhancement sentence, imposed for the use of a firearm during the commission of a felony, must be served day by day. In *Comer*, it was expressly ruled that T.C.A. § 39–6–1710(a)(2) is rendered inoperative in respect to crimes that have occurred on or after July 1, 1982. In the instant case T.C.A. § 39–6–1710(a)(2) was not applicable. The enhanced sentence, had it been otherwise valid, was subject to the Criminal Sentencing Reform Act of 1982.

■ Next, it is insisted that the trial judge erred in sentencing the appellant as a standard offender, Range I, rather than as an especially mitigated offender. We note that the trial judge conducted a thorough pre-sentence hearing wherein his sentencing considerations included the appellant's assertion of mitigating factors. Assuming there had been a proper verdict of guilty of voluntary manslaughter wherein a firearm was found to have been used as charged, we find that there has been no showing of abuse of discretion by the trial judge's adjudication of the appellant as a standard offender, Range I. This issue is without merit.

■ Finally, as conceded by the State, the trial court erroneously concluded that by reason of T.C.A. § 39–6–1710(a)(2), it was without jurisdiction to suspend the appellant's sentence. The trial court was confronted with an obvious conflict in the statutory law of sentencing. Since the ru ling of the trial court a panel of this Court has held that T.C.A. § 40–35–303(a) of the Tennessee Criminal Sentencing Act of 1982, has rendered T.C.A. § 39–6–1710(a)(2) inoperative in respect to crimes that have been committed on or after July 1, 1982. *Comer v. State, supra.*

We have addressed each of the issues raised, but having determined that the evidence preponderates against the verdict of the jury, we reverse the judgment and dismiss the case.

BYERS and CORNELIUS, JJ., concur.