# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
### Assigned on Briefs January 15, 2013

## STATE OF TENNESSEE v. CLIFTON WILLIAMS, JR.

**Appeal from the Circuit Court for Rutherford County**
**No. F-65511      David Bragg, Judge**

**No. M2012-00902-CCA-R3-CD - Filed July 30, 2013**

A jury convicted the defendant, Clifton Williams, Jr., of voluntary manslaughter, a Class C felony. The defendant also pled guilty to unlawful possession of a firearm by a felon, a Class E felony. He was sentenced as a Range II offender to eight years' confinement for the manslaughter conviction and four years' confinement for the felon in possession of a firearm conviction, to be served consecutively. The defendant appeals, challenging the sufficiency of the evidence supporting his conviction for manslaughter. The defendant also asserts that the trial court erred in failing to include the definition of curtilage in the self-defense instruction, in enhancing the defendant's sentences, and in imposing consecutive sentences. After a thorough review of the record, we affirm the judgments of the trial court.

## Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

PAUL G. SUMMERS, SR.J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Gerald Lynn Melton, District Public Defender; and John Driver and S. Ray White, Assistant District Public Defenders, for the appellant, Clifton Williams, Jr.

Robert E. Cooper, Jr., Attorney General & Reporter; Rachel E. Willis, Senior Counsel; William C. Whitesell, District Attorney General; and Jennings H. Jones and Jude P. Santana, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Facts and Procedural Background

The defendant's convictions are the result of an encounter initiated by three men who came to the defendant's back door at night, banging on the door and demanding that the defendant come out to tell them the whereabouts of a person named "Small Head," whom they believed to be inside but who was actually a previous resident of the apartment. The defendant ultimately shot and killed one of the men, who was standing in the nearby parking lot. The victim had a gun in his pocket.

The defendant was indicted for first degree premeditated murder and unlawfully possessing a handgun after having been convicted of a felony. During the jury trial, the State's first witness was Jose Zavala, one of the three men who had come to the defendant's door. Mr. Zavala testified that around 9:00 p.m. on February 22, 2010, he returned home to find his back door open, window broken, and his television and two video game consoles missing. He called two of his friends, James Coats and Daniel Cartwright, the victim, to help him discover information about the break-in, and they came over to his home. He then received information from another acquaintance which led him to go to the defendant's apartment. As "it was starting to get darkish," the three walked over to the residence. He was not aware of whether or not any of the threm had a weapon.

For "about five minutes straight" Mr. Zavala knocked on the door and received no response. At the end of that time, the defendant appeared on the other side of the pane of glass in the door, and Mr. Zavala asked for Jerome or his brother, who went by the name "Small Head." The defendant stated he did not know them, and Mr. Zavala countered that he had dropped them off at the residence the previous week. The defendant then said that they no longer lived there, which Mr. Zavala found suspicious. The defendant refused to come outside to talk to Mr. Zavala, who was joined by Mr. Coats on the porch. Mr. Zavala testified that he told the defendant to come out and talk to them. He did not try to force his way into the house or threaten to do so, did not threaten the defendant with harm, and did not brandish a weapon at the defendant. He testified he did not observe anyone other than the defendant point a weapon that night.

While Mr. Zavala was speaking with the defendant, Brandon Buchanan, who lived next door and was an acquaintance of Mr. Zavala's, came out, and Mr. Zavala jumped off the defendant's porch and went to Mr. Buchanan's. Mr. Buchanan informed him that Jerome and his brother no longer lived there. Mr. Zavala and Mr. Buchanan spoke for about five minutes, and in the meantime, Mr. Coats had moved off the porch, and he and the victim were standing "boxed in between two cars." Mr. Zavala testified that at that point, "the door

-2-

flew open," and the defendant came out and started shooting "straight ahead at" Mr. Coats and the victim. Mr. Zavala fled after the third or fourth shot was fired. Mr. Zavala and Mr. Coats reunited at Mr. Zavala's house but were unable to contact the victim. Mr. Zavala's ex-girlfriend called the police looking for the victim, and Mr. Zavala and Mr. Coats went to the station, where Mr. Zavala gave a statement and identified the defendant from a photographic line-up as the shooter.

Mr. Zavala's written statement recited the theft/burglary and his attempt to retrieve the stolen property. He stated that the three men knocked on the back door and that the defendant would not open the door or come out, which Mr. Zavala characterized as "weird and shady." The neighbors came out, and Mr. Zavala went to talk to Mr. Buchanan, who told him that "Small Head" didn't live there anymore. The defendant then swung open the door and charged down the stairs shooting.

On cross-examination, Mr. Zavala testified that he had not initially called the police regarding the burglary because he did not think the police would recover his possessions. He acknowledged he called Mr. Coats because he suspected Mr. Coats was involved in the burglary of his home. He testified that he did not know that the victim had a weapon and that Mr. Buchanan's porch was about five or six feet from the defendant's porch. Apparently referring to the proximity of the victim and Mr. Coats to the defendant's porch, Mr. Zavala testified they were "real close" and agreed that the distance might have been ten feet. He testified that the defendant did not pause but was shooting "as soon as the door flew open." He could not see Mr. Coats or the victim because a car was blocking his view. He testified that he and Mr. Coats stayed at his house for about three hours after the shooting. He acknowledged that he had called jails looking for the victim. Mr. Zavala testified he was wearing a hoodie during the incident but took it off to go to the police station. On redirect examination, Mr. Zavala testified that the defendant emerged from his home and began walking down the steps shooting with his arms held straight ahead.

The State next called James Coats, who had accompanied the victim and Mr. Zavala to the defendant's home. Mr. Coats's testimony was substantially the same as Mr. Zavala's regarding the events that led to the men approaching the defendant's home. Mr. Coats testified he was not armed. Mr. Zavala knocked a "regular knock" on the door, and Mr. Coats and the victim stood between two cars about ten feet or less from the door while Mr. Zavala spoke to the defendant, asking for Small Head or Jerome. Mr. Coats joined Mr. Zavala after six or seven minutes and told the defendant that "this ain't got nothing to do with you. I'm just trying to find my friend's stuff or find out where Small Head and Jerome are...." Mr. Zavala told Mr. Coats that he had heard the defendant fasten the dead bolt. Mr. Coats denied threatening the defendant and testified that the defendant was smiling during the entire conversation and did not appear frightened. When the neighbors came out, Mr.

Coats went back and stood with the victim, and Mr. Zavala went to the neighbors' porch to talk with them. At that point, Mr. Coats heard the door open, and the defendant emerged, told them, "This is my house," and began to shoot. Mr. Coats testified that he did not wear contact lenses and could not see well at a distance.

Mr. Coats's written statement, which was generally consistent with his testimony, was introduced into evidence. Mr. Coats wrote that Mr. Zavala was very mad about the burglary of his home. According to the written statement, the defendant would not come out, locked the deadbolt and left briefly. The defendant continued to deny knowledge of the crime, in Mr. Coats's opinion, "sarcastically." The neighbors came out, and Mr. Zavala left to talk to them. Mr. Coats went to stand by the victim. The defendant burst out the door, and Mr. Coats turned to face him, thinking the defendant would try to "swing on" him. The defendant started firing, and Mr. Coats felt a bullet go by his face and ran.

On cross-examination, Mr. Coats testified he and the victim had smoked marijuana earlier that day. Mr. Coats testified he and the victim were in the parking lot, next to the concrete walkway that led from the apartment's back porch to the parking lot, when the shooting happened. He testified they arrived at 11:00 p.m. and that Mr. Zavala knocked two or three times before the defendant came to the door, and that the defendant could see Mr. Zavala through the door.

Daniel Parkhurst, an officer with Murfreesboro Police Department, testified that he responded to a report of shots fired, which he received at 10:57 p.m. At first, he found no evidence of shots fired, but a resident in the complex alerted him that the shots had come from behind the residence. He found the victim lying on his back between two vehicles. Officer Parkhurst interviewed potential witnesses. Mary Hathaway, her brother, and Mr. Buchanan, who all lived in the apartment next to the defendant, told him they had heard a shot but had not seen anything. Officer Parkhurst spoke with the residents of the defendant's apartment, including the defendant, who told him that he had been in the shower and heard someone banging on the back door. The defendant told Officer Parkhurst that as he came down the stairs, he heard a shot and then silence. Officer Parkhurst also interviewed Shirley Davidson and Geraldine Carruth in the defendant's apartment. Both women testified they had been asleep when they were awoken by a gunshot. The woman who lived on the other side of the defendant told Officer Parkhurst that she had heard six to eight gunshots but had been too frightened to look outside. She had instead alerted 911. Officer Parkhurst secured the scene.

On cross-examination, Officer Parkhurst agreed that the victim's feet were past the front wheel of the vehicle next to which he was lying. He testified that the residents of the neighborhood where the crime took place were not always cooperative and occasionally gave

-4-

conflicting statements to police.

Dr. Sandra Thomas of the Medical Examiner's Office performed the victim's autopsy. She determined that the cause of death was a gunshot wound which entered below his left eye. She testified the victim would have dropped "like a rock," would have had no further motor control, and would have been unable to put a weapon into his pocket. The victim's blood tested positive for marijuana.

Detective Ed Gorham of the Murfreesboro City Police Department investigated the scene. The victim's body, was discovered between two vehicles in the parking lot. Detective Gorham testified that the porch of Mr. Buchanan's apartment was about twenty feet from the porch of the defendant's apartment. He testified the victim was not directly in front of the door, but off to the side. Detective Gorham interviewed the residents of Mr. Buchanan's apartment, who told him they had heard a shot but had not seen anything. Ms. Carruth told Detective Gorham she was asleep on the couch, heard someone at the backdoor, then heard a shot. Ms. Davidson told him that she was asleep upstairs when the defendant woke her to tell her to call 911 because he had heard shots. The defendant told Detective Gorham that he was getting into the shower, heard someone at the back door, then heard one shot. Detective Gorham searched the scene for bullet casings and looked inside five or six nearby trash cans for evidence.

Detective Gorham found a gun in the victim's front pocket. The gun contained a clip with five bullets but had no bullet in the chamber. Detective Gorham testified it would have taken only one or two seconds to ready the gun to fire. The victim had $213 in his pocket. Detective Gorham testified that the victim was white and did not look Hispanic. Detective Gorham testified that he later examined the door of the defendant's apartment and described it as weak, noting that it "rocked in the doorframe." He found no footprints on the door or other evidence it had been kicked.

Later that night, Detective Gorham spoke to Mr. Zavala and Mr. Coats. Detective Gorham then brought the defendant to the police station, where he signed a waiver of his right to remain silent and gave a statement in keeping with what he had told police earlier regarding hearing a shot. In the recorded interview, the defendant stated he had been about to get in the shower when someone kicked the door and began shouting for "Small Head." He saw three men, two of whom were Hispanic and wearing hoodies. The defendant stated he heard gunshots and told his girlfriend to call the police. When Detective Gorham informed him that he had been picked from a line-up, the defendant asked for a lawyer.

The defendant later requested to speak with Detective Gorham again, and he gave a second statement. In his second recorded interview, the defendant stated he was in the

kitchen when there was a knock at the door. Three men were asking for "Small Head," who had robbed them, and they demanded that the defendant open the door. The defendant stated that two Hispanic males who were wearing hoodies had guns, but he did not even pay attention to the third man who stayed in the parking lot. The defendant saw the man with the blue hoodie step off the porch and saw a weapon in his hand. One of the men jiggled the doorknob. The defendant stated that he believed the men were going to come into the house. Mr. Buchanan came out and spoke with one of the men for a "brief second." During this time, the defendant, who had not intended to open the door, got the gun. He did not brandish the weapon and thought the men might be assaulting his neighbor. The defendant stepped out, asking why they were there, and the man wearing a black hoodie turned around with a gun in his hand and said, "F--- it." The defendant jumped off the porch to avoid being shot and emptied the gun. The defendant gave his gun to another man who was not Mr. Buchanan.

The defendant gave a written statement confirming what he had told detectives in the second interview. The defendant heard someone knock on or kick his back door and try to open it. He saw three men, two of whom had guns in their hands. The men asked for "Small Head." The neighbors came out, and the defendant retrieved his weapon. The defendant opened his door to ask why the men were there, and one of the men raised his gun. The defendant "ducked sideways" and shot without looking. He then told his girlfriend to call the police.

On cross-examination, Detective Gorhamconfirmed that there were several children sleeping in the defendant's apartment. He testified the victim did not have a permit to carry the semi-automatic weapon with him. No fingerprints were found on the victim's weapon, and it was in good working condition. The bullets in the victim's weapon were hollow-point bullets, designed to maximize damage to the target. The victim's pockets also contained papers commonly used for smoking marijuana. Detective Gorham testified that he measured the distance from the defendant's door to the victim's belly button with a tape measure, and it measured twenty-one feet. He testified that the porch was about four feet wide, and the victim was lying on his back so that his feet would have been closest to the porch.

Detective Gorham identified the defendant's weapon and stated it had six empty casings in it. He confirmed that Mr. Zavala and Mr. Coats did not come to the police station until about three and a half hours after the shooting. Mr. Zavala was wearing a plaid jacket and baseball cap, and Mr. Coats had a blue sweatshirt and hat.

The State next presented the testimony of Detective Richard Presley of the Murfreesboro Police Department. After Mr. Buchanan advised him to look in a trash can, Detective Presley recovered the weapon from a trash can that had previously been searched.

The gun was in plain sight on top of the trash and contained six spent cartridges.

Don Carman, the supervisor of the forensic firearms identification unit for the Metropolitan Nashville Police Department Crime Laboratory, testified that the weapon recovered from the trash can fired the six spent cartridges and the bullet recovered from the victim's head. Mr. Carman testified that the victim's weapon was functional and had been fired previously.

The defendant called several witnesses to testify regarding the events. Geraldine Carruth, a friend of the defendant's girlfriend Shirley Davidson, testified that she was asleep on the couch while Ms. Davidson, Ms. Davidson's two oldest daughters, and Ms. Davidson's six-month-old grandchild were upstairs. Ms. Carruth heard pounding and kicking as though someone were trying to break down the door. She heard men asking for "Small Head" and threatening to "break down the f---ing door" and come into the house. The disturbance continued for two to four minutes, and Ms. Carruth was afraid for her safety. Ms. Carruth heard the door open and shut, covered her head with blankets, and heard gunshots. She saw the defendant run through the living room, and she ran upstairs. Ms. Carruth testified that the police came and asked if they knew who it was outside, but they did not give any information. The next day, Ms. Carruth contacted the police, told them she would be leaving for her home state that evening, and asked if they wanted a statement; they declined. On cross-examination, she testified that at one point, she heard the defendant say, "What the f---; is that a gun?"

Mary Hathaway, the defendant's neighbor, had been asleep upstairs in her home when she heard loud arguing, banging, and people calling for "Small Head" to come out. She heard the voices say, "We're going to kick the door down if you don't come out." Ms. Hathaway, her son, and her brother went outside, where three men wearing hoodies were on the defendant's porch. Ms. Hathaway did not see any guns and told the men that "Small Head" had moved away.

Ms. Hathaway's son, Mr. Buchanan, then recognized Mr. Zavala, and two of the men came to Ms. Hathaway's porch. One of the men stood next to a car in front of the defendant's apartment. The defendant came out of his home, looked towards the group on Ms. Hathaway's porch, and said something. Then the defendant looked the other way. Ms. Hathaway stated, "I don't know what happened," and the defendant started shooting. The defendant's gun went off two or three times and he continued shooting as he fell off the porch. Ms. Hathaway testified that the defendant was standing on the second step leading up to his porch. About a minute had elapsed since the defendant emerged. Ms. Hathaway stated she at first told the police she didn't see what had happened, but she subsequently gave a statement when she discovered that the defendant was being tried for murder because "It

wasn't murder." She reiterated that the victim and his friends were not knocking softly but banging on the door, and that they threatened to kick the door down.

On cross-examination, she stated she had given the police a different story because she did not want to get involved. She testified that after the defendant looked toward the victim "I don't know what – if he seen someone or what, but he just started shooting."

Ms. Hathaway's recorded interview told the events leading up to the shooting as she had related them at trial. Ms. Hathaway first told police there were four men, but then told the police she had only seen three but someone had told her there were four. Ms. Hathaway stated that they almost had the situation under control prior to the shooting. Three or four bullets went over the victim's head. The defendant fell, and Ms. Hathaway speculated that he thought the victim was going to come at him and kept shooting. Ms. Hathaway did not see any of the men with weapons. Ms. Hathaway told the police that she had not told them what she saw because she was scared that the men might come back to her house. She acknowledged she had spoken to the newspaper.

Ms. Hathaway's written statement gave the same version of the events leading up to the shooting. In her written statement, she said two of the three men came to her porch and another was standing between two cars. The defendant came out, looked at the group on her porch, looked at the other man, and started shooting and then fell on the ground. They did not at first tell police what they saw but decided to speak up because they did not believe what happened was murder.

Brandon Buchanan, Ms. Hathaway's son, testified that he heard banging on the neighboring apartment's door. He looked out the window and saw three men dressed in black. Because they had guns, he thought they were the police. Ms. Hathaway came down and told him the men were talking about "Small Head," and Mr. Buchanan looked out the window again and recognized Mr. Zavala. He went outside, and Mr. Zavala and another man came to his porch while the third man continued to stand by a car. Mr. Buchanan tried to clear up the misunderstanding regarding the residence of "Small Head," and the two men were listening to him, but the third man "was still standing right there like he was still going to go in there like we was lying or something." Mr. Buchanan testified that the defendant came out and asked the men what they were doing and told them "Small Head" did not live there. The victim, who was wearing all black, then "got to pulling like he was reaching for something and that's when the shots start going off." Mr. Buchanan elaborated that he saw the victim "pulling for" something but did not see a weapon come out of his pocket. Mr. Buchanan testified he also heard the men threaten to come into the house.

Mr. Buchanan's statement to the police was introduced into evidence. In his

statement, he wrote that the defendant came out, stepped down, and told the men "Small Head" was not there. The man by the defendant's house said, "F--- that. Small Head in ther[e]," and reached "for a weapon or s[omething]." The defendant started shooting and fell back, and the other three men ran.

On cross-examination, he testified that he was not afraid of Mr. Zavala and had calmed Mr. Zavala down. Nobody other than the defendant fired a weapon. He testified that the defendant was on the bottom step of the porch and had the weapon behind his back until the victim made a motion. At that point, the defendant fell back and started shooting. The men on the porch had guns when Mr. Buchanan first looked out but had put them away when he came out of the house.

The defendant testified regarding the events of that night. The defendant testified that he had been living in the apartment for approximately one month with his girlfriend and with four children, one of whom was his grandson. That night, a little before eleven, the defendant was the only one awake, and he was in the kitchen when he heard banging on the back door. The back door had an uncovered porch with concrete steps leading up to it and a walkway to the parking lot, where there was a "No Trespassing" sign. The defendant looked out and saw two men with hoodies. One of them had a gun in his hand, and the other was trying to hide a gun. A third man was standing by the cars in the parking lot. The men demanded for the defendant to open the door and for "Small Head" to come out; Mr. Coats brandished his weapon and threatened to kick the door in. The defendant told the men that there were children in the house. The defendant then heard the neighbors' door open, and Mr. Zavala, who was in a blue hoodie, left the porch. The defendant retrieved the gun and went outside. Mr. Coats, who was wearing a black hoodie, was at the bottom of the steps on the sidewalk.

At this point, Mr. Coats advanced toward the defendant, who came out of the home. Mr. Coats and the defendant met at the steps. The defendant put his hand out, and Mr. Coats grabbed his arm. The defendant ended up at ground level, and Mr. Coats pulled a gun from his left pocket. The defendant took out his gun and fired it. The defendant fell and fired more shots into the air. He testified that he felt his life was being threatened when he shot his gun. The defendant then ran through the living room and out the front door, and he threw away the gun. The defendant had a cell phone in his home but did not know where it was.

The defendant initially lied to the police because he didn't know what to do. He stuck with his first story during the first police interview because he was scared. During the second interview, the defendant told the truth except that he made up a story about asking someone else to throw away the gun.

On cross-examination, the defendant initially testified that he was on the porch or steps when the shooting started, but he subsequently clarified he was on the ground when the shooting started. The defendant stated he lied during his first interview because he was scared and did not know how to tell the police what had happened. The defendant stated that he had not previously told the police that Mr. Coats grabbed his arm because he "didn't think to say he grabbed my arm at that moment" and "didn't know how to explain it." The defendant testified he had seen the victim with a weapon, but the victim had not drawn or pointed his weapon and was not posing a threat when he was shot. He did not call the police because he did not know where the phone was and did not want to leave through the back door, which was partially broken and could not be secured.

In rebuttal, the State called Detective Gorham, who testified that Ms. Carruth left him a message the day after the shooting and that he returned her call after ten o'clock at night, when she was out of the state. Detective Gorham testified he asked her for a written statement when she returned to the state but had not heard from her, despite other attempts to contact her.

After reviewing the trial court's instructions, the defense asked for the definition of curtilage to be included with the self-defense instruction. The trial court denied the defendant's request to include the definition of curtilage in the self-defense instructions based on the fact that the trial court found that the defendant's door was closed, and the altercation had ceased when the defendant left his home. Instead, the trial court charged the jury regarding the defendant's claim of self-defense, including that the defendant had no duty to retreat "if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds." The trial court did not instruct the jury regarding the presumption of a reasonable belief of imminent death or serious bodily injury against one who unlawfully and forcibly enters a dwelling or residence.

The jury convicted the defendant of voluntary manslaughter. On appeal, the defendant challenges the sufficiency of the evidence, essentially asserting that the State did not prove beyond a reasonable doubt that the defendant did not act in self-defense. The defendant also challenges the failure to instruct on the definition of curtilage, the length of the sentences, and the trial court's order that the sentences be served consecutively.

## II. Law and Analysis

## A. Sufficiency of the Evidence

An appellate court must set aside a finding of guilt if the evidence at trial was insufficient to support that finding beyond a reasonable doubt. Tenn. R. App. P. 3(e). In determining whether the evidence supporting a conviction is insufficient, the appellate court does not ask itself whether it believes that the evidence established guilt beyond a reasonable doubt, but determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn from it. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). A guilty verdict rendered by the jury and approved by the trial court accredits the testimony of the State's witnesses and resolves all conflicts of evidence in favor of the prosecution's theory. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence." *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003). This Court also may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The defendant bears the burden of proving that the evidence was not sufficient to sustain the conviction. *Hall*, 8 S.W.3d at 599.

The defendant was convicted of voluntary manslaughter, which is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a) (2010). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result" and knowingly with respect to the result of the conduct "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(a), (b). The question of whether the provocation was adequate falls to the province of the jury. *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).

The defendant does not dispute the evidence supporting the elements of the crime, but alleges that the proof at trial showed he was acting in self-defense. If a defendant's conduct was statutorily justified, he may raise the justification as a defense to prosecution. T. C. A. § 39-11-601. Under the self-defense statute,

> a person who is not engaged in unlawful activity and is in a
> place where the person has a right to be has no duty to retreat

-11-

before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2).[1] The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. T.C.A. § 39-11-201(a)(3); *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001). Whether a defendant acted in self-defense is a factual question for the jury to determine. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). In evaluating whether the defendant acted in self-defense, the jury must determine whether the defendant's belief in imminent danger was reasonable, whether the force employed by the defendant was reasonable, and whether the defendant was without fault. *State v. Renner,* 912 S.W.2d 701, 704 (Tenn. 1995).

The defendant presented evidence supporting his claim that he acted in self-defense. The defendant testified that three armed men were banging on his door late at night and brandishing weapons. He testified that Mr. Coats grabbed his arm, that Mr. Coats pulled out a gun, and that this was what prompted him to fire his weapon at Mr. Coats. Mr. Buchanan testified that the victim made a motion as though he were pulling out a weapon. The victim was found with a weapon in his pocket.

However, taking the evidence in the light most favorable to the State, as we must, there was also ample evidence supporting the State's theory that the defendant did not act in

---

[1] Subsection (a) of this statute formerly read: "A person is justified in threatening or using force against another person when, and to the degree, the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force." T.C.A. § 39-11-611(a) (2006). This statute was amended in 2007, and former subsection (a) was replaced with a list of definitions. Consequently, unlike the sections delineating other justifications, *see* T.C.A. §§ 39-11-612, -614(a), section 611 does not explicitly state that a person is justified in employing force in self-defense. We note that the Sentencing Commission's Comments have also not been renumbered to reflect the current subsections of the statute.

self-defense. Mr. Zavala testified that he did not threaten to force his way into the house and did not have or brandish a gun. He testified that while he was speaking to Mr. Buchanan, the door flew open and the defendant immediately began to fire at Mr. Coats and the victim. Mr. Coats testified that he did not have a weapon or threaten the defendant and that the defendant emerged, told them it was his house, and began to shoot. Both men testified that they were not aware the victim had a weapon and that the victim never displayed a weapon. Ms. Hathaway told police that she saw no weapons and that the situation was almost under control when the defendant emerged, looked toward her porch, looked at the victim, and started shooting. The defendant initially hid his role in the shooting from police, and he threw the weapon, which had been emptied in the altercation, in the trash can.

The evidence consisted of conflicting testimony regarding the series of events leading to the shooting and the placement of the persons involved. Determining the credibility of witnesses belongs to the province of the jury. We conclude that a reasonable trier of fact could have found that the defendant intentionally or knowingly killed the victim in a state of passion produced by adequate provocation to lead a reasonable person to act in an irrational manner. We also conclude that the evidence was sufficient to allow a jury to conclude beyond a reasonable doubt that the defendant was not acting in self-defense.

### B. Jury charge

The defendant next contends that it was error for the trial court to refuse to include the definition of "curtilage" in the jury charge. The trial court has a duty to give a complete charge of law pertaining to issues raised by the evidence and material to the defense. *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001). This is true even if the defense did not request the charge. *State v. Meyer*, No. E2009-02294-CCA-R3-CD, 2010 WL 4618352, at *11 (Tenn. Crim. App. Nov. 16, 2010); *see Sims*, 45 S.W.3d at 9; *see also State v. Allen*, 69 S.W.3d 181, 188 (Tenn. 2002) ("The evidence, not the theories of the parties, controls whether an instruction is required."). In determining whether an defense has been raised by the evidence, the court must look at the evidence in the light most favorable to the defense and decide whether there is evidence that reasonable minds could accept establishing the defense. *Sims*, 45 S.W.3d at 9. An erroneous jury instruction is subject to a harmless error analysis. *State v. Garrison*, 40 S.W.3d 426, 434 (Tenn. 2000) (holding that "harmless error analysis is appropriate when evaluating omissions of an essential element of an offense from the jury charge").

Tennessee Code Annotated provides that a person is justified in using force intended or likely to cause death or serious bodily injury if: "(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury; (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real

-13-

at the time; and (C) The belief of danger is founded upon reasonable grounds." T.C.A. § 39-11-611(b)(2), -601. While a person acting in self-defense outside the home must meet the requirements listed in subsections (A) through (C), a person acting within the home under certain circumstances is entitled to a presumption that the fear of imminent death or serious bodily injury was reasonable:

> Any person using force intended or likely to cause death or serious bodily injury within a residence, business, dwelling or vehicle is presumed to have held a reasonable belief of imminent death or serious bodily injury to self, family, a member of the household or a person visiting as an invited guest, when that force is used against another person, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, business, dwelling or vehicle, and the person using defensive force knew or had reason to believe that an unlawful and forcible entry occurred.

T.C.A. § 39-11-611(c).

In the self-defense statute, a dwelling is "a building or conveyance of any kind, including any attached porch, whether the building or conveyance is temporary or permanent, mobile or immobile, that has a roof over it, including a tent, and is designed for or capable of use by people." T.C.A. § 39-11-611(a)(5). A residence is "a dwelling in which a person resides, either temporarily or permanently, or is visiting as an invited guest, or any dwelling, building or other appurtenance within the curtilage of the residence." T.C.A. § 39-11-611(a)(7). The section on self-defense defines curtilage as "the area surrounding a dwelling that is necessary, convenient and habitually used for family purposes and for those activities associated with the sanctity of a person's home." T.C.A. § 39-11-611(a)(3). Black's Law Dictionary defines "appurtenance" as "[s]omething that belongs or is attached to something else" and provides by way of example that a garden is an appurtenance to the home. *Black's Law Dictionary* (9th ed. 2009).

While the trial court gave a complete jury instruction on self-defense, it did not instruct the jury either on the presumption of reasonableness in the home or the definition of curtilage, as requested by the defense. We note that the record does not show that the defendant requested the instructions on the presumption of reasonableness applicable to the home; however, the trial court's duty to instruct did not depend on such a request. *Meyer*, 2010 WL 4618352 at *10-11; *see Sims*, 45 S.W.3d at 9.

In *State v. Bottenfield*, 692 S.W.2d 447 (Tenn. Crim. App. 1985), the defendant shot

a man in the curtilage of her home, when he was within twenty feet of the entrance. Immediately prior to the shooting, the victim had been inside the house and had assaulted the defendant and her disabled stepfather and had broken her mother's leg, and the victim was threatening to again assault the defendant and enter the home. The trial court did not charge the jury with the law regarding defense of the home, and the appellate court reversed. In doing so, the appellate court held that "[o]ne's own home or dwelling includes the curtilage thereof." *Bottenfield*, 692 S.W.2d at 452. Likewise, in *State v. Edwards*, the appellate court reversed the trial court for failure to include the instructions on the presumption of reasonableness inside the home. *State v. Edwards*, No. 01-C-019007CR00171, 1991 WL 165819, at *4 (Tenn. Crim. App. Aug. 30, 1991). *Edwards* reaffirmed that a dwelling includes the curtilage, where "the victim entered the residence, made threats, grabbed a machete, and raised the weapon against the defendant at or near the front door of the defendant's residence," and was found lying dead on the front porch. *Id.* at *3.

However, in *State v. Meyer*, this Court declined to reverse the trial court for a failure to charge the presumption of reasonableness when the victim was shot in the curtilage. *Meyer*, 2010 WL 4618352, at *11. The Court distinguished *Bottenfield* and *Edwards* on the ground that in both *Bottenfield* and *Edwards*, the victim had previously entered the home. *Id.* More critically, we note that both *Bottenfield* and *Edwards* were decided applying the law prior to the statutory codification of the definitions of "dwelling," "residence," and "curtilage." *See* T.C.A. § 39-2-235 (Supp. 1988). As the Court notes in *Meyer*, "[t]he curtilage itself is not defined as a part of the residence for purposes of the self-defense instruction." *Meyer*, 2010 WL 4618352, at *11. Under the statute, a dwelling does not include the curtilage of the home, while a residence includes only any appurtenance within the curtilage.

In *State v. Gayden*, this Court affirmed the defendant's conviction for second degree murder when the victim had unlawfully entered the home but had subsequently left and was in the yard. *State v. Gayden*, No. W2011-00378-CCA-R3-CD, 2012 WL 5233638, at *13 (Tenn. Crim. App. Oct. 23, 2012). In *Gayden*, the unarmed victim had entered his ex-wife's home without permission after learning that the defendant was inside. The defendant and victim had a confrontation during which the defendant held a gun, and the victim forced his ex-wife outside and assaulted his ex-wife. The victim began to leave but confronted the defendant instead. The defendant pushed the victim and shot him. *Id.* at *1-3. This Court concluded that the trial court did not err in refusing to instruct the jury on the presumption of reasonableness, because "although the victim entered the home unlawfully, the victim left the home and the imminent threat ended." *Id.* at *13.

We conclude that the reasoning in *Gayden* applies to the facts of this case. While the defendant's uncovered porch may be an appurtenance within the curtilage of the home and

therefore part of his residence as defined by statute, and while (in the light most favorable to the defendant) Mr. Zavala and Mr. Coats may have unlawfully and forcibly entered it by disregarding the "No Trespassing" sign and brandishing weapons, we need not decide whether the facts of the entry fit the statutory requirements because, as the trial court concluded, the situation had been defused and Mr. Zavala and Mr. Coats had left the property when the defendant emerged and fired his weapon. The testimony of the defendant and (to some extent) his neighbor that a weapon was drawn by one of the former intruders certainly fairly raised the question of self-defense, but the trial court properly gave this instruction to the jury. The defendant's own testimony was that he was on the ground, in the curtilage, when he began to shoot, and therefore the defendant was not entitled to the presumption of reasonable belief of imminent death or serious bodily injury that applies when a person uses force "within a residence." T.C.A. § 39-11-611(c). The defendant had the opportunity to show that he held such a belief and was justified in firing his gun under Tennessee Code Annotated section 39-11-611(b)(2). The trial court did not err in refusing to give the instruction regarding the presumption.

## C. Sentencing Issues

The defendant contends that the trial court erred in sentencing him above the statutory minimum and in imposing consecutive sentences. Recently, in *State v. Bise*, the Tennessee Supreme Court replaced the de novo standard of review and presumption of correctness previously applied to sentencing with an abuse of discretion standard under which the decision of the trial court is granted a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). This standard of review applies to sentences imposed within the appropriate statutory range. *Id.* at 708. The Court in *Bise* concluded that "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." *Id.* at 706.

Under Tennessee Code Annotated section 40-35-115, the trial court may impose consecutive sentences if the trial court finds by a preponderance of the evidence that the defendant committed the offense while on probation. T.C.A. § 40-35-115(b)(6). We review the imposition of consecutive sentences for an abuse of discretion. *State v. Hayes*, 337 S.W.3d 235, 266 (Tenn. Crim. App. 2010).

The defendant does not challenge the trial court's application of enhancement factors. He contends that the sentences are improper under Tennessee Code Annotated sections 40-35-102 and -103 because they reflect an "unjustified disparity in sentencing" because the shooting only came about as a direct result of the three men banging on the defendant's door late at night and demanding "Small Head."

-16-

The record shows that at the sentencing hearing, the trial court stated that it had considered the factors listed in Tennessee Code Annotated section 40-35-210(b). The trial court applied as an enhancement factor to the manslaughter conviction the fact that the defendant employed a firearm. *See* T.C.A. § 40-35-114(9). The trial court enhanced both sentences based on the fact that the defendant was on probation at the time. *See* T.C.A. § 40-35-114(13)(c). The trial court found that no mitigating factors applied. The sentences were ordered to be served consecutively based on the fact that the defendant was on probation when the crimes were committed. *See* T.C.A. § 40-35-115(b)(6). The trial court noted it was sentencing the defendant above the minimum based on the enhancement factors and because the sentence was necessary to protect society because the credible testimony at trial had shown that the disruptive situation had been defused when the defendant came out of his home and began firing the gun.

The trial court imposed sentences within the correct range, and the trial court explained how the sentences were consistent with the purposes and principles of sentencing. The sentences were imposed after the trial court weighed statutorily mandated factors, including the enhancement factors which the trial court determined applied to the defendant's case. Consecutive sentencing was based on finding one of the factors in Tennessee Code Annotated section 40-35-115(b). The trial court did not abuse its discretion.

### III. Conclusion

Based on the foregoing, we affirm the judgments of the trial court.

_____
PAUL G. SUMMERS, Senior Judge

-17-